UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

AM GENERAL LLC,

     Plaintiff,

v.

DEMMER CORPORATION,

     Defendant.

Cause No. 3:12-CV-00333-WCL-RBC

**OPINION AND ORDER**

Plaintiff AM General. LLC ("AM General") brought this contract action against Defendant, Demmer Corporation ("Demmer"), seeking recovery of amounts it allegedly overpaid to the Defendant under their contract. [D.E. 1]. Demmer counterclaimed seeking payment of monies AM General withheld from it under the contract. [D.E. 11].

From June 16, 2014 through June 20, 2014, the undersigned presided over a non-jury trial in which the parties were afforded a full opportunity to be heard, examine and cross-examine witnesses, present evidence bearing on the issues, and argue the law and the evidence. After the trial, both parties submitted Revised Proposed Findings of Fact and Conclusions of Law [D.E. 202; D.E. 203], which the Court has thoroughly reviewed along with the citations to the trial transcript and other record evidence.

Having had the opportunity to observe the witnesses, evaluate their demeanor, qualifications, and credibility as well as to independently review hundreds of documentary exhibits and all deposition transcript excerpts submitted for review separate and apart from the

excerpts read into the record at trial, the Court now, pursuant to Federal Rule of Civil Procedure 52(a), makes the following Findings of Fact and Conclusions of Law.

## JURISDICTION

AM General is a Delaware limited liability company with its principal place of business in South Bend, Indiana. AMG's sole member is AM General Holdings LLC, a Delaware limited liability company with its principal place of business in South Bend, Indiana. AM General Holdings LLC has two members, MacAndrews AMG Holdings LLC and The Renco Group, Inc. MacAndrews AMG Holdings LLC is a Delaware limited liability company whose sole member is MacAndrews & Forbes Holdings, Inc., a Delaware corporation with its principal place of business in New York, New York. The Renco Group, Inc. is a New York corporation with its principal place of business in New York, New York.

Demmer Corporation ("Demmer") is a Michigan corporation with its principal place of business in Lansing, Michigan. This Court has jurisdiction of the underlying dispute based upon diversity of citizenship pursuant to 28 U.S.C. §1332. [D.E. 147 at p. 2].

## FINDINGS OF FACT

1.      AM General manufactures and sells the High Mobility Multipurpose Wheeled Vehicle ("HMMWV" or "HUMVEE") family of vehicles to, among others, the United States Government ("TACOM" or "Government"). Am. Pretrial Order (D.E. 147), Stipulations of Fact ("Stip.") ¶ 1.

2.      Starting in 2007, Demmer manufactured and sold Bi-Metal Doors to AM General for integration into the HMMWVs that AM General manufactured for the Government. Bi-

Metal Doors are a type of armored door.  AM General purchased Bi-Metal Doors from Demmer pursuant to eight (8) separate purchase orders, which were called "blanket contracts."  Stip. ¶ 6.[1]

3.      From time to time, AM General would modify a blanket contract to add a new line item.  Sometimes, AM General would send the new line item only as a change blanket contract, and other times it would send the entire blanket contract, listing all line items of the blanket contract including the most recent line item containing the modification.  Stip. ¶ 8.

4.      In 2009, AM General began negotiating with the Government for a new contract to govern the Government's purchase of HMMWVs between 2010 and 2013.  Stip. ¶ 10.

5.      To support its negotiations with the Government, AM General issued various Requests for Quote ("RFQs") in June 2009 to its suppliers, including Demmer.  Stip. ¶ 11.

6.      AM General sent Demmer an RFQ requesting Demmer to propose new firm-fixed prices for 2010-2013 for parts included in the "Aluminum Program," which included the Bi-Metal Doors (the "June RFQ").  Stip. ¶ 12.  The June RFQ was an excel spreadsheet, PTX-2, the first tab of which was  PTX-1.  Stip. ¶ 13.

7.      The June RFQ stated that any contract resulting from the RFQ process would be subject to AM General's standard noncommercial terms and conditions for government contracts, found at PTX-3.[2]  Stip. ¶ 14.

8.      The terms and conditions contained in PTX-3 applied to AM General's purchase, in 2010 and 2011, of Bi-Metal Doors from Demmer.  Stip. ¶ 15.

A.      <u>**AM General Requests Demmer's Cost or Pricing Data in Writing.**</u>

---

[1] The AM General part numbers for the Bi-Metal Doors are:  6039226; 6039226T2; 6039227; 6039227T2; 6039324; 6039324T2; 6039325; 6039325T2.  These part numbers comprise the front left, front right, rear left, and rear right doors in each of two different colors.  Stip. ¶ 7.

[2] Throughout this Order, Plaintiff's exhibits are designated as "PTX ___" while Defendant's exhibits are designated as "DTX ___."  Numbers following the hyphen refer to the page number of the exhibit.

9. On July 21, 2009, AM General Buyer Roger Mills wrote Demmer's Marie Roberts and requested that Demmer submit certified cost or pricing data to support its July 2009 proposal for 2010 shipments of Bi-Metal Doors. PTX-013-001; Tr. 196:10-197:6 (Mills). Demmer Executive Tim Dargitz received a copy of this request for certified cost or pricing data and understood its meaning. PTX-192 (Dargitz Dep.) 44:12-45:7, 47:16-48:19. (Based on internal questions, Mills conducted further research at AM General in August and September of 2009 and confirmed his understanding that Demmer was required to submit certified cost or pricing data. Tr. 206:21-208:8, 209:3-210:14 (Mills).) On multiple occasions, Mills explained that Demmer had the option either to provide the cost or pricing data to the Government or to supply it directly to AM General. PTX-013-001, PTX-014-001, PTX-015-001, PTX-019-001; Tr. 197:12-25 (Mills).

10. Demmer elected to provide the cost or pricing data directly to AM General and to allow AM General to audit Demmer's 2010 Bi-Metal Door proposal and the cost data supporting that proposal. Tr. 212:15-25 (Mills); PTX-024-001; PTX-030-001.

11. Both Demmer and AM General understood that Demmer would not certify its cost or pricing data for the 2010 price proposal until after final agreement on price. PTX-014-001; Tr. 198:15-23 (Mills); Tr. 260:9-10 (McConville); PTX-195 (Roberts Dep.) 54:13-55:1.

**B.     Demmer's Experience with Cost or Pricing Data, Audits, and NTE Pricing**

12. As of the summer of 2009, Demmer had experience submitting and certifying cost or pricing data. Tr. 198:24-199:11, 213:16-22 (Mills); PTX-192 (Dargitz Dep.) 24:4-18, 25:10-16, 28:20-29:6, 29:22-30:8; PTX-008-001 (5/21/08 certificate of current cost or pricing data signed by Demmer). Demmer also had experience with supplier and government audits. Tr. 641:17-18, 683:10-684:16 (Shawa-DeCook); PTX-192 (Dargitz Dep.) 77:18-22, 78:22-

79:14.  Demmer also had experience in being required to renegotiate its pricing downward after an audit of its certified cost or pricing data.  Tr. 213:1-214:6 (Mills).

13.     Demmer itself had previously issued purchase orders using not-to-exceed prices. Tr. 724:3-5 (Shawa-DeCook).  Demmer's executives understood that a NTE or "not to exceed price" is an interim or placeholder price that is subject to revision downward based on further audit and/or negotiations.  PTX-192 (Dargitz Dep.) 158:10-15; PTX-194 (McDonald Dep.) 206:4-7, 207:1-7; PTX-197 (Sjoberg Dep.) 178:1-10.

14.     Demmer also received regular advice from a government contracting consultant. Tr. 725:1-13 (Shawa-DeCook); *see, e.g.*, PTX-058-001 (1/6/10 email discussing DCAA[3] audits and warning that "Demmer has to be prepared for significantly more oversight by the Government").  In January 2010, that consultant advised Demmer of the risks of accepting government contracts with not-to-exceed pricing.  Tr. 725:20-726:2 (Shawa-DeCook); PTX-066-001.  When a Demmer employee received that information, he forwarded it to Demmer's Chief Financial Officer as well as two Demmer executives (Koch and Dargitz) who attended an important meeting with AM General on February 4, 2010.  PTX-066-001; Tr. 726:21-727:4 (Shawa-DeCook).

### C.     Demmer's First Two Price Proposals for 2010 Bi-Metal Door Pricing

15.     In July 2009, Demmer submitted a proposal in response to the June RFQ.  This was Demmer's first proposal for Bi-Metal Doors to be delivered in 2010 and future years.  Tr. 870:6-15 (Tenlen).  Using the prices Demmer proposed in July 2009 and the quantities contained in the June RFQ, the proposed contract was expected to exceed $650,000 in value.  PTX-2, Tab "REQUEST FOR QUOTE"; PTX-4; PTX-5; Stip. ¶ 16; *see also* PTX-12.

---

[3] "DCAA" is the Defense Contract Audit Agency.  DCAA is part of the Department of Defense and conducts audits of contractor (and subcontractor) proposals (as well as post-award audits).  Tr. 259:5-9 (McConville).

16.     Demmer's Karl Tenlen prepared the first proposal.  Tr. 870:6-9 (Tenlen).  Before Demmer submitted its proposal for 2010 pricing to AM General, Tenlen presented it to Demmer's executive team, including Dargitz, Matt Heppler, and Heather Shawa-DeCook.  Tr. 870:13-871:3 (Tenlen).

17.     The Bi-Metal Door was not a "commercial item" as defined expressly by the Federal Acquisition Regulation ("FAR") or as defined by reference in the Truth in Negotiations Act ("TINA").   Stip. ¶ 17; *see also* PTX-020-005, -008–009 (Demmer's "assertion of commerciality" over various parts other than the Bi-Metal Doors).

18.     Demmer's contract with AM General for the Bi-Metal Door was sole sourced in 2009 and 2010.  Tr. 107:8-13 (Peterson); Tr. 199:12-201:4, 202:3-203:5 (Mills); PTX-015-001.  The Bi-Metal Door had been sole sourced to Demmer since at least 2007.  Tr. 107:14-18, 152:3-6 (Peterson).

19.     The June RFQ required Demmer to submit a "cost breakdown" with its proposal.  PTX-001-003, ¶ 14; Tr. 110:3-9 (Peterson).  A cost breakdown is a detailed description of the various elements that tells AM General "all the elements that make up th[e] price."  Tr. 110:10-21 (Peterson); Tr. 269:7-11 (McConville) ("A cost breakdown is a description of the cost elements that are included in a cost, so it would be labor, material, overhead, and any other elements of cost."); PTX-192 (Dargitz Dep.) 33:4-34:11 (cost breakdown is "all the different cost elements that feed into a proposal or agreed upon price").

20.     In generating price proposals, AM General expects suppliers to use actual costs as much as possible and build up the unit price using actual, reliable cost information plus a specified profit rate.  *See* Tr. 110:22-111:9 (Peterson).

21.     The total price proposed by a supplier must be fair and reasonable.  *See* PTX-001-003, ¶ 14; Tr. 108:8-21, 111:2-9 (Peterson); Tr. 262:1-13 (McConville); Tr. 684:24-685:12 (Shawa-DeCook); Tr. 869:25-870:5 (Tenlen); PTX-192 (Dargitz Dep.) 75:9-17.

22.     Demmer provided cost or pricing data in response to the June 2009 RFQ.  *See* PTX-097-001 (9/8/10 email in which Demmer's chief accountant confirmed to DCAA that Demmer had provided cost or pricing data to AM General for Demmer's 2010 price proposal); PTX-192 (Dargitz Dep.) 71:7-72:4 (explaining that AM General's audit of Demmer's proposal for Bi-Metal Door pricing for 2010 was "to review cost—cost or pricing data, which we provided to them [AM General]"); PTX-194 (McDonald Dep.) 155:2-5 ("Q. Is it your understanding that Demmer had provided AM General with cost and pricing data to support the selling prices for 2010? A. Correct.").

23.     Demmer knew in the fall of 2009 that only Demmer was being asked to quote the Bi-Metal Door in response to the June RFQ.  PTX-015-001; Tr. 200:13-201:4, 202:10-203:5 (Mills); PTX-017-002 (handwritten notes of Demmer's COO dated 7/28/10, "10. Doors are in Gov. audit. Not competed."); PTX-032-001 (handwritten notes of Demmer's COO dated 9/21/10 that read under "AMG-Audit," "1. Sole sourcing of alu. doors reasons for audit"); PTX-197 (Sjoberg Dep.) 91:14-92:2; PTX-192 (Dargitz Dep.) 55:25-56:3, 56:11-15.

24.     In August 2009, Demmer revised and resubmitted its proposal to account for new aluminum pricing provided by AM General.  Stip. ¶ 18.  This was Demmer's second proposal for 2010 pricing.  Tr. 871:22-872:2 (Tenlen); PTX-026-001, PTX-27.  The only change to the first proposal was to account for a change in the price of aluminum.  Tr. 872:3-6 (Tenlen).

25.     Tenlen, who prepared Demmer's price proposals, had not conducted any investigation of the labor costs associated with Bi-Metal Doors before he submitted the first two

proposals.  Tr. 871:19-872:10 (Tenlen).  He had undertaken no such investigation between 2007 and 2009.  Tr. 871:7-14 (Tenlen).  The labor hours Demmer submitted in the first two proposals were 27.491 hours per door, which came from Demmer's original 2007 proposal.  Tr. 872:15-24 (Tenlen).  Tenlen had prepared the first two submissions without any expectation of having to show AM General his work.  Tr. 873:18-21 (Tenlen).

26.    On July 29, 2009, after Demmer submitted its first price proposal, Demmer learned that AM General had decided to purchase from another supplier certain armor parts that Demmer had previously supplied.  PTX-018-001.  AM General advised Demmer that it was changing suppliers for those parts because Demmer's prices for those parts were too high.  PTX-192 (Dargitz Dep.) 68:9-15; PTX-017-002 (handwritten notes of Demmer's COO dated 7/29/09, "Highly likely we are losing the steel parts due to price.").  Given this loss in business, Demmer was "concerned [it] could lose all parts, including the doors."  PTX-197 (Sjoberg Dep.) 54:24-55:6.

27.    Around this time period, Demmer learned that AM General expected that the Government would request an 8 percent reduction in the prices it was paying.  AM General itself was not asking Demmer for a price reduction.  Tr. 924:3-6 (Tenlen) ("Q. Okay. Now, did you want to do something to reduce the price because AM General was asking you for a price reduction? A. They were not asking for a price reduction, no.").

28.    Given its concerns about losing parts to other suppliers and Demmer's understanding of the Government's likely negotiation position, Demmer adjusted its proposal to achieve an eight percent reduction in price.  *See infra* ¶¶ 32-33.

29.     In connection with its various price proposals for Bi-Metal Doors, including Demmer's December 2009 price proposal, Demmer did not provide AM General with accurate or complete data. *See infra* ¶¶ 32-33, 39-45; Tr. 551:2-5 (Bingham).

### D.     AM General's Audit Request and Demmer's Revised Price Proposal

30.     On or about August 3, 2009, AM General informed Demmer that it intended to audit Demmer's proposal for 2010 prices. PTX-021-001, PTX-022-001, PTX-024-001.

31.     When Demmer's CFO learned that AM General wanted to audit Demmer's proposal, she reviewed Demmer's previous submission and deemed the data that Demmer had supplied to AM General "inadequate." Tr. 638:4-8 (Shawa-DeCook).

32.     Demmer began working on another revised price proposal. Demmer's change to its price proposal was not, however, the result of an objective analysis of its cost structure. *See, e.g.*, PTX-032-001 (handwritten notes of Demmer's COO dated 9/21/10, under "AMG-Audit," "Make strong cost assumptions" and "Give them what is advantageous to you"); PTX-197 (Sjoberg Dep.) 91:14-92:25. Rather, Demmer internally decided to establish the 8 percent reduction as an end-point, and re-work the data to back into that final number. *See* PTX-183-008 (identifying as a task to "make a target cost model (not for viewing) that maintains an 8% reduction"); PTX-185-001 (cost matrix for the rear left Bi-Metal Door captioned in handwriting, "TARGET").[4] The resulting cost breakdown that Demmer submitted to AM General therefore was incomplete and inaccurate.

32.1     Demmer's COO testified that Demmer targeted an 8 percent reduction in its price proposal. PTX-197 (Sjoberg Dep.) 55:8-20. Tenlen, Shawa-DeCook, Heppler, and Dargitz all reported, directly or indirectly, to the COO, Sjoberg. PTX-197

---

[4] Although Demmer claims that AM General's Don Plude directed Demmer to reduce its price by 8 percent, there is no evidence that Plude or anyone else at AM General encouraged or advised Demmer to achieve such a reduction by backing into the cost numbers. That would contradict AM General's requirements. Tr. 110:22-111:9 (Peterson); *see also* PTX-001-003. Moreover, Tenlen—who prepared the proposal—denied that AM General requested an 8 percent price reduction. Tr. 924:3-6 (Tenlen).

(Sjoberg Dep.) 28:9-24; Tr. 868:19-23 (Tenlen). Sjoberg testified that the size of the reduction Demmer offered to AM General was made with "team approval" that "went through the whole organization up to and including Bill Demmer." PTX-197 (Sjoberg Dep.) 36:3-9; *see also id.* at 35:6-25 (identifying as team members himself, Shawa-DeCook, Heppler, McDonald, Tenlen, and Dargitz).

32.2　Tenlen, a lower-level Demmer employee, claimed that he was not working towards a target, but acknowledged on cross-examination that "after we had already prepared our quote, there was some analysis" and "there was an analysis to compare, that it happened to come out to an eight percent [reduction] . . . ." Tr. 877:6-25 (Tenlen).

32.3　Tenlen also conceded that "at one point during this activity," he prepared a "target matrix," which is "an analysis of changing variables to get a predicted result." Tr. 880:9-15 (Tenlen). He also made a "target cost model." Tr. 880:16-17 (Tenlen). Tenlen labeled that target cost model, "not for viewing." Tr. 881:4-7, 15-16 (Tenlen). The purpose of the target cost model "was to maintain an eight percent reduction." Tr. 881:12-14 (Tenlen). The target cost model was to see if the final price number stayed above 8 percent. Tr. 882:5-12 (Tenlen). His handwritten notes, from an "audit prep" meeting, also note, "Make a cost model using the 353 percent info. All else being equal, enter 300 percent and see if the number stays above 3550—This must be!" PTX-183-005; Tr. 882:18-24 (Tenlen). (The price in Demmer's third proposal was $3538 for front doors and $3579 for rear doors—an average price of $3,558.50 per door. PTX-042-014, -016.)

32.4　In a document dated October 15, 2009—four days before the meeting with AM General when Demmer unveiled its third price proposal—Tenlen generated a cost model on which he wrote "TARGET" in all caps at the top. PTX-185-001; Tr. 883:10-21, 884:2-7 (Tenlen). The model that is shown in the document is, "Bi-Metal Doors 09-0708 Quote Matrix 10-15-09 with 355 Burden." PTX-185-001. This coincides with the burden rate in Tenlen's other notes around the same time period. *See* PTX-183. (The "burden" or overhead rate is part of the overall cost that is included in the price proposal. *See, e.g.*, Tr. 814:2-10 (Tenlen); PTX-194 (McDonald Dep.) 59:19-60:3.)

32.5　This targeted price reduction, unrelated to Demmer's actual cost structure, was consistent with an idea from Demmer's CEO, Bill Demmer, who suggested to Shawa-DeCook, Sjoberg, and Dargitz in late August 2009 that Demmer "offer to negotiate a price reduction for all of our AMG armor prior to audit, a price that we would find MORE acceptable than a price negotiated from an audit[.]" PTX-028-001. Shawa-DeCook agreed that "a pre-negotiation would be beneficial" but did not think it would be possible if DCAA were involved. PTX-029-001. The price reduction likewise was based on Demmer's concern about losing additional business from AM General. *See supra* ¶ 27.

32.6    Tenlen claimed that the 8 percent reduction in price reflected in the cost breakdown that he generated was not a target, but instead the result of an analysis that just "happened to come out to an eight percent [reduction]" that Demmer executives had targeted. Tr. 876:18-878:7 (Tenlen). This claim is not supported by the persuasive record evidence.

33.    When it submitted revised price proposals to AM General, Demmer did not disclose the fact that it was backing into an 8 percent price reduction.

### E.    Demmer's Revised Price Proposal Unveiled at the October 19, 2009 Meeting

34.    On October 19, 2009, AMG representatives Stephen Hodge, Todd Lentych, and Dean Fiess traveled to Demmer to begin auditing Demmer's proposal for 2010 prices for Bi-Metal Doors. Stip. ¶ 19.

35.    At the October 19, 2009 meeting, Demmer presented changes to the cost breakdown supporting Demmer's 2010 Bi-Metal Door proposal. The changes resulted in a reduction to the price Demmer had proposed in August 2009. Stip. ¶ 20.

36.    The price changes that Demmer identified at the October 19, 2009 meeting were a surprise to AM General. Tr. 640:2-5 (Shawa-DeCook); Tr. 876:3-10 (Tenlen); PTX-194 (McDonald Dep.) 31:15-32:2. Demmer had continued to work on its revised price proposal up until the night before or morning of the meeting. Tr. 639:11-13 (Shawa-DeCook); Tr. 832:10-15 (Tenlen). This last-minute work coincided with Demmer's effort to make its price proposal come out to an 8 percent price reduction. *See supra* ¶¶ 32-33.

37.    After the October 19, 2009 meeting, Demmer re-submitted its 2010 Bi-Metal Door proposal with lower pricing reflecting cost breakdown changes that Demmer described at the October 19, 2009 meeting. Stip. ¶ 21. This was Demmer's third proposal for 2010 pricing. Tr. 875:13-20 (Tenlen). After the meeting, Demmer submitted the third proposal with a revised cost breakdown to AM General in spreadsheet form. PTX-041-001 & PTX-042-014, -016, -020.

**F.** **Demmer's December 2009 Price Proposal and the Data Demmer Provided in Response to AM General's Audit Requests**

38.     In December 2009, Demmer revised and submitted its 2010 Bi-Metal Door proposal to account for new aluminum pricing provided by AM General.  Stip. ¶ 22.  The only change between Demmer's October 2009 proposal (sometimes referred to as Submission Number 3) and Demmer's December 2009 proposal (sometimes referred to as Submission Number 4) was the change in the aluminum price.  Tr. 386:22-387:11 (Lentych); Tr. 640:8-16 (Shawa-DeCook).

39.     Demmer's October and December 2009 proposals were based in part on Demmer's projection that it would take 14.59 hours of direct labor to make each Bi-Metal Door assuming that in 2010, Demmer manufactured the number of Bi-Metal Doors projected in the June 2009 RFQ.  Stip. ¶ 23.

40.     Demmer's own cost data revealed that it typically took Demmer between only 4 and 6 hours to make each Bi-Metal Door.  PTX-047-005; Tr. 688:24-689:8 (Shawa-DeCook).

41.     When AM General asked for additional information to substantiate Demmer's 14.59 labor hours projection in the fall of 2009, Demmer recognized the discrepancy.  *See* PTX-048-001 (McDonald email to Tenlen providing the actual labor hours data and noting that it was "not what you wanted the totals to come out to") & PTX-049-005.

42.     Demmer nevertheless did not correct the inaccurate labor hours projection it used to support its 2010 price proposal.  Instead, Demmer, without disclosing the fact to AM General, aggregated the Bi-Metal Door labor hour data with data from a different, more labor-intensive door.  *See* Tr. 392:18-393:2 (Lentych); 554:1-14, 555:19-556:3 (Bingham).

> 42.1    In early December 2009, Demmer representatives Tenlen, Shawa-DeCook, Dargitz, Koch, and Angell discussed "[t]he concern [ ] that the cost breakdown that Dean [Fiess] has been presented shows 14.59 hours

per door." PTX-050-001; Tr. 691:9-14 (Shawa-DeCook); Tr. 890:13-23, 891:6-13 (Tenlen).

42.2    After this meeting, Demmer included in its labor hours calculation the amount of time it took to make the Bi-Metal Door and the Frag 5 Door. Tr. 638:13-17 (Shawa-DeCook); Tr. 845:1-4 (Tenlen). The Frag 5 Door was a separate, and more labor-intensive door. Tr. 392:18-393:2 (Lentych); 554:1-14, 555:19-556:3 (Bingham).

42.3    Demmer's CFO believed that AM General would question the averaging of labor hours from two different doors. Tr. 693:2-6 (Shawa-DeCook). She believed that, if Demmer did average the labor hours for Bi-Metal Doors and Frag 5 doors, Demmer would need to explain the logic behind doing so and demonstrate to AM General why averaging the labor hours for the two doors made sense. Tr. 693:7-16 (Shawa-DeCook).

42.4    Demmer, however, did not disclose to AM General that it was aggregating the labor hours for two different products in the data supporting Demmer's 2010 price proposal. Tr. 482:14-18, 500:5-8 (Fiess); Tr. 551:6-25 (Bingham). To the contrary, Demmer furnished information designed to mask the fact that the labor hours projection combined labor hours for making two different products. *See* PTX-53-001 ("I'll have to run the mandates for both doors and make sure that they tie out and try to do something that will combine them that will look system generated."); PTX-054-001 (Shawa-DeCook confirms that she had already asked Tenlen to generate a "system generated" report).

    42.4.1    Demmer contends that it disclosed the blending of the labor hours to AM General, or that AM General should have realized that Demmer had done so. The persuasive and credible evidence adduced at trial weighs against this position.

    42.4.2    Shawa-DeCook could not recall telling anyone at AM General that Demmer was averaging hours for Bi-Metal Doors and Frag 5 doors. Tr. 694:3-6 (Shawa-DeCook). Nor could she point to anyone else at Demmer who did so. Tr. 694:7-9 (Shawa-DeCook).

    42.4.3    The documents that Demmer provided to AM General did not disclose that data from two different doors had been aggregated (even if Demmer did not send the "system generated" report in PTX-53 to AM General). *See* PTX-051-001 (12/9/09 Tenlen email to Fiess providing three months of "Charged Labor Hours" without referencing the source of the information or even a project code); Tr. 846:19-22 (Tenlen) ("I do not indicate that in this e-mail, no."); *see also* PTX-056-001 (12/17/09

13

Tenlen email to Fiess referencing "two project codes" but not disclosing that the two different codes come from two different doors); Tr. 897:19-898:6 (Tenlen) (agreeing that he did not identify anywhere in PTX-56 that one of the project codes was for Bi-Metal Doors and one was for Frag 5 doors). PTX-56 includes handwritten identification of two project codes—without any explanation of what those project codes mean.

42.4.4    Tenlen chose from a six-month menu of labor hour information and chose to provide Fiess with three months of labor hour information that reflected the higher value, rather than the lower value. Tr. 896:8-10 (Tenlen); PTX-55-001; *see also* PTX-046-001 (12/1/09 Tenlen email to Koch, "I will get you a selection of weeks to choose from. With that, maybe we can find some numbers that fall in our favor.").

42.4.5    Fiess credibly and persuasively testified that he does not believe he knew that Demmer was combining the information from the two doors in 2009. Tr. 482:14-18 (Fiess). Fiess typically kept information received from suppliers in written form, usually through email correspondence to maintain "a good record to establish . . . what we were talking about." Tr. 475:14-20 (Fiess). If that information had been disclosed to him orally at the time, he would have written it down, as was his practice. Tr. 475:21-476:4, 482:23-483:11, 485:5-13 (Fiess); *see also* Tr. 498:22-25 (Fiess); Tr. 500:5-8 ("Q. Mr. Fiess, you understood, December '09, numbers of doors shipped there, included both FRAG 5 and Bi-Metal Doors, right? A. I don't believe that was the case."). There is no evidence of any written disclosure.

42.5    Lentych, who scrutinized Fiess's analysis of the labor hours, had no reason to believe from Fiess's written reports or conversations with Fiess that the Bi-Metal Door labor hour data that Fiess had received from Demmer also included labor hour data for the Frag 5 door. Tr. 391:16-392:7 (Lentych). If the data that Fiess reviewed included Frag 5 door data, Lentych would have wanted to know and expected to know that—from both Fiess and Demmer. Tr. 392:8-20 (Lentych). Based on Lentych's knowledge at the time, there are significant differences in cycle times between the two doors that would have impacted his review of the information. Tr. 392:18-393:2 (Lentych).

42.6    Tenlen's testimony does not support the conclusion that he told Fiess about the blending of the data for the two doors; rather, consistent with Fiess's recollection and the contemporaneous document, Tenlen advised Fiess that Demmer was supplying two project codes, but did not explain

14

that the two codes corresponded to two different doors. *See* Tr. 850:22-851:6 (Tenlen) (referring to combining different project codes, but not mentioning Frag 5 doors); Tr. 851:17-852:7 (Tenlen) (talking about Tenlen sending PTX-56, which did not disclose anything about Frag 5 doors); Tr. 852:24-853:3 (Tenlen) ("Q. Did you have such a discussion about the information that you sent in PTX 56? A. Well, the discussion was in advance of that, not after the fact, and, as I told you, I told him that it was two different projects"—but again not mentioning Frag 5 Doors); Tr. 925:12-22 (Tenlen) (testifying, on redirect, that he "believe[s]" he told Fiess that "he was going to be getting a break-out of two different reports, which would have been FRAG 5 and Bi-Metal," but not testifying that he advised Fiess what the two codes meant).

43. Demmer's decision to aggregate Frag 5 and Bi-Metal Door labor hours rendered the results that AM General received inaccurate and incomplete. It takes longer to make a Frag 5 Door than a Bi-Metal Door. Tr. 554:1-14, 555:19-556:3 (Bingham). The Court takes special note that Demmer's retained witness, Jimmy Jackson, did not consider this question. Tr. 1041:17-23 (Jackson). Moreover, Jackson's analysis of the aggregating of the Bi-Metal and Frag 5 door data assumed, at the threshold, the central issue: that the greater the number of Bi-Metal Doors produced in a month, then the more time spent on Bi-Metal Doors would be improperly reflected in the Frag 5 labor hour data. Tr. 1040:12-18 (Jackson). Jackson's claim that it was appropriate to aggregate the data, therefore, is circular. *See also* Tr. 1041:24-1042:11 (Jackson) (confirming that he did not evaluate any correlation between the percentage of doors that were Bi-Metal relative to the combined hours per door or whether, as the percentage of combined doors that are Bi-Metal goes up, the combined labor hours per door go up or down).

44. Additionally, Demmer did not support its projection that the amount of time it would take to make a Bi-Metal Door would nearly double if the volume of doors produced dropped. Based on a reliable analysis of the data, the inverse correlation between hours-per-door and door volume is weak and does not support the 14.59 hour projection that Demmer proposed. Tr. 556:8-557:3, 557:25-558:8 (Bingham).

45.     The evidence convincingly established that Demmer's personnel intentionally provided data that would inflate the projected costs in the 2010 price proposal.  *See, e.g.*, PTX-198 (Tenlen Dep.) 223:14-224:6.  For instance,  when DCAA sought to audit Demmer's price proposal in the fall of 2010, Demmer personnel recognized that its "obvious exposure is in direct labor hours."  PTX-102-001.  Likewise, when AM General announced that it wanted to continue its audit on November 2, 2010, Demmer's CFO advised the Demmer personnel involved in defending Demmer's costs, "there will be a big story to prepare between now and when they [AM General] arrive."  PTX-108-001.  Also, On November 10, 2010, Tenlen directed two Demmer employees to "work 'outside' of mandate and simply look at the personnel roster and list names of associates that 'touch' AMG door parts."  PTX-112-002.  "Frankly, I want the numbers to be on the aggressive or high side."  *Id.*  He told them to use a "generalized head count process," rather than Demmer's electronic time tracking system, to generate a labor hours number.  He advised them, "We want the higher number."  *Id.*

46.     Tenlen generated a cost matrix, named "CURRENT STAFFING SUMMARY," with an hours-per-door figure of 14.68 hours per door at a quantity of 40,000 doors.  Tr. 919:12-920:10 (Tenlen); PTX-111-015.  Tenlen came to this projection even though actual labor hours in 2010 were less than 7.5 hours per door.  Tr. 920:11-13 (Tenlen).

### G.     Dean Fiess's December 2009 Report

47.     On December 18, 2009, Dean Fiess circulated within AM General a report on the analysis he had completed as of that date of Demmer's proposal for 2010 prices.  DTX-AA.  His report analyzed the information that AM General had received from Demmer as of that time.  Tr. 509:10-12 (Fiess).  In circulating his report internally, Fiess noted that Demmer's proposed labor hours of 14.59 "can be improved or possibly negated provided Demmer/Karl can back up their

14.59 hours with more data points, etc." DTX-AB-001. The internal circulation of a report by Fiess did not mean that AM General's audit of Demmer was complete or finished. Tr. 493:22-494:2 (Fiess); Tr. 112:10-12 (Peterson); Tr. 393:3-16 (Lentych).

48.     Fiess worked in the Finance Department. Tr. 114:18-20 (Peterson); Tr. 473:20-24 (Fiess). He supported the Supply Chain Management department with supplier audits from time to time. Tr. 114:18-23 (Peterson); Tr. 400:11-20 (Lentych); Tr. 474:4-14 (Fiess).

49.     Although AM General sent the report to TACOM, no one advised Demmer of that fact. Tr. 734:23-25 (Shawa-DeCook); Tr. 854:3-10 (Tenlen). There is no record evidence that anyone at TACOM reviewed, commented on, or even read the document. There is no record evidence that Demmer ever learned about Fiess's report or that AM General provided a copy of the report to Demmer before discovery in this litigation. Accordingly, regardless of the substance of Fiess's report, Demmer could not have relied upon it in December 2009 or January 2010 to conclude that AM General had completed its audit of Demmer.

50.     Contemporaneous documents further confirm that Demmer believed that AM General's audit of Demmer was ongoing during December 2009-January 2010. For example, on January 13, 2010—nearly a month after Fiess had circulated his report internally—Demmer's Dargitz advised AM General that "DCAA is requesting an audit on the bi-metal doors[.]" DTX-AF-003. Dargitz was surprised at the request because, as he advised AM General's Plude, "I thought that's what your guys were doing." *Id.* After discussing the issue internally at AM General, Plude reported back to Dargitz "that AMG is ok with the DCAA audit and that Demmer needs to support it [the DCAA audit] *along with our effort*." DTX-AF-002 (emphasis added). There is no record evidence that AM General advised Demmer that the AM General audit of Demmer was over as of the date of this email, January 14, 2010.

51.     Members of AM General's Supply Chain Management Department did not agree with all of Fiess's conclusions in the report.  Tr. 116:1-117:4 (Peterson); Tr. 390:2-10 (Lentych). In particular, both Peterson and Lentych had questions about the number of labor hours Demmer had projected to build a door.  Tr. 116:6-18, 184:9-185:11 (Peterson); Tr. 390:11-391:6 (Lentych).  Disagreement with information in a report generated by Fiess was not controversial or unusual.  Tr. 117:5-14 (Peterson).

52.     After reviewing the Fiess report, Peterson directed the Supply Chain Management team (lead by Lentych) to get additional information from Demmer.  Tr. 117:15-25 (Peterson). This was consistent with Peterson's usual practice of reading Fiess's comments and then discussing those comments with the Supply Chain Management team under his direction and directing those personnel, rather than Fiess, to follow up with any additional work.  Tr. 185:13-24 (Peterson); *see also* Tr. 937:4-14 (Castelluccio) (explaining that the audit report was sent to TACOM but that subsequent activities "could cause additional information to be obtained"); Tr. 976:12-976:20 (Plude) (even with Fiess's December Report in hand, Supply Chain Management still needed to conduct additional audit work, which could be done as the parties began to negotiate prices).

53.     AM General's Supply Chain Management department had final responsibility over supplier audits, for reviewing the information received during supplier audits, for determining if a supplier's price is fair and reasonable, and for determining if the information provided by the supplier during an audit is adequate.  Tr. 112:25-113:14 (Peterson); Tr. 436:10-15 (Lentych).

54.     After reading the Fiess Report, on January 25, 2010, Lentych sent a detailed email to Demmer identifying "a number of points that AMG would like to discuss with Demmer

before this audit can be closed." PTX-065-001; Tr. 393:3-394:1 (Lentych). Lentych identified questions about Demmer's proposed profit rate, overhead, labor hours, and volumes. *Id.* When Lentych sent this email on January 25, 2010, both AM General and Demmer understood that AM General's audit of Demmer was open. Tr. 266:18-20 (McConville); Tr. 393:3-5, 394:2-21 (Lentych); Tr. 485:14-486:10 (Fiess); Tr. 696:22-25 (Shawa-DeCook) ("Q. And so you understood that, as of the date of this e-mail, January 25th, 2010, AM General's audit was still open, correct? A. Yes."); Tr. 899:3-5 (Tenlen) ("As of January 25th, you understood that AM General's audit was still open, correct? A. I did, yes."); PTX-194 (McDonald Dep.) 145:23-146:4, 149:19-21 (same).

55.     The overwhelming and supported evidence was that as of January 25, 2010, Demmer and AM General had not agreed to settled pricing for Bi-Metal Doors to be shipped in 2010. Tr. 267:12-19 (McConville); Tr. 486:3-10 (Fiess).

### H.     In February 2010, Demmer Invokes the DCAA Audit To Put AM General's Audit on Hold.

56.     In early January 2010, the Defense Contract Audit Agency ("DCAA") initiated its own audit of Demmer's 2010 Bi-Metal Door price proposal. PTX-059-001.

57.     Demmer attempted to persuade DCAA not to conduct the audit. *See generally* PTX-69, PTX-71. Shawa-DeCook corresponded with DCAA multiple times, questioning the need for a DCAA audit. *Id.*

58.     Shawa-DeCook had substantial financial incentives for minimizing Demmer's "audit givebacks," which are "any reduced proposal pricing that came from a negotiation of a proposal." Tr. 706:6-707:4 (Shawa-DeCook); PTX-088-006 (Shawa-DeCook's scorecard, listing as the "Goal" for audit givebacks in 2010 "0%" and identifying the AM General audit as one of the audits being measured); PTX-144 (listing "0%" as the goal for audit givebacks).

Shawa-DeCook receives a discretionary management bonus based, in part, on audit givebacks—that is, reduced proposal pricing that came from audits and negotiations. In 2008, her bonus was $1.5 million. Tr. 706:3-707:17 (Shawa-DeCook).

59.     By February 12, 2010, Shawa-DeCook had successfully persuaded DCAA to put its audit of Demmer's 2010 price proposal on hold. PTX-077-001; Tr. 650:3-9, 701:12-16 (Shawa-DeCook); PTX-192 (Dargitz Dep.) 141:7-9.

60.     Demmer did not advise AM General that DCAA had put its audit of Demmer's 2010 price proposal on hold. *See infra* ¶¶ 94-97.

**I.      The February 4, 2010 AM General-Demmer Meeting**

61.     On February 4, 2010, AM General representatives Stephen Hodge, Todd Lentych, and Dean Fiess traveled to Demmer. Stip. ¶ 24.

62.     The purpose of the February 4, 2010 meeting was "a continuation of the audit." Tr. 486:1-2 (Fiess); *accord* Tr. 400:5-10 (Lentych).

63.     At the outset of the meeting, Demmer's Dargitz "approached Todd Lentych and asked him if AM General was going to finalize prices, and Todd said, 'No, that's not what we're doing here.'" Tr. 486:5-10 (Fiess).

64.     At the February 4, 2010 meeting, Dean Fiess requested Demmer to provide 12 months of 2009 labor hour data. Stip. ¶ 25.

65.     Demmer did not provide the data that Fiess requested. Tr. 400:21-23, 401:12-25, 402:3-403:1 (Lentych); PTX-83-001 (3/4/10 email from Demmer's Tenlen to AM General's Lentych advising, "I owe . . . some supporting information regarding our labor hours calculation on the door assembly quotes. At this time, we are holding off on sending any further information until the DCAA audit is closed.).

66. Demmer invoked a competing DCAA audit as the reason not to provide additional information to AM General.  Tr. 400:21-401:7 (Lentych); Tr. 856:18-857:13 (Tenlen); Tr. 858:13-24 (Tenlen) ("[W]e [Demmer] brought up the fact that we cannot be audited by both of you at the same time, one has to take precedence over the other, and it was agreed that, right at that point, any future labor information or questions being answered, that DCAA would take precedence."); *see also* Tr. 643:12-15 (Shawa-DeCook); 647:23-648:4 (Shawa-DeCook) ("I suggested that we do not supply any additional information to AM General while the DCAA audit was underway."); PTX-067-001 (2/3/10 internal Demmer email, "Given that DCAA is proceeding, we need to continue and complete the audit with them therefore I strongly recommend AMG not coming [sic] tomorrow.  We will complete the DCAA audit and then resume negotiations with AMG once the audit report is complete."); PTX-068-001 (2/3/10 internal Demmer email, "Is this after my email to Tim stating that I strongly disagree with them [AM General] still coming? DCAA states [sic] audit proceeds given yesterday's announcement and we really should be dealing with them now.  Resume AMG negotiations once DCAA is complete.").

### J. At Demmer's Request, AM General Puts Its Audit on Hold

67.     At Demmer's request, AM General agreed to put its audit on hold pending the resolution of the DCAA Audit.  Tr. 118:16-22 (Peterson); Tr. 400:9-10, 400:21-401:4 (Lentych); Tr. 697:9-11 (Shawa-DeCook), Tr. 698:5-8 (Shawa-DeCook) ("Q. And so you wanted the AM General audit to be put on hold, right? A. I wanted to deal with DCAA, yes, so, yes, it would put AMG on hold to DCAA."); Tr. 856:18-857:13 (Tenlen); *see also* Tr. 903:9-14 (Tenlen) (confirming that, at the end of the February 4, 2010 meeting, AM General did not say that its audit of Demmer was complete); PTX-194 (McDonald Dep.) 55:3-25; *see also id.* at 55:22-25 ("Q. So you understood from talking to Ms. Shawa-DeCook that the AM General audit would be put on hold until the DCAA audit was finished. A. Correct.").

68.     As of March 4, 2010, both AM General and Demmer understood that AM General's audit of Demmer was on hold and therefore remained open.  PTX-083-001 (3/4/10 Tenlen email to AM General:  "At this time, we are holding off on sending any further information until the DCAA audit is closed."); Tr. 703:19-23 (Shawa-DeCook); *see also* PTX-083-001; Tr. 906:24-907:11, 908:18-909:8 (Tenlen); PTX-194 (McDonald Dep.) 63:13-22 (testifying about PTX-84, dated 3/5/10, and agreeing that it was her understanding that, as of that time, the AM General audit remained open).  As of March 4, 2010, Demmer also knew that AM General understood that it was "not going to get any more information from Demmer until the DCAA audit was closed[.]"  Tr. 700:20-23 (Shawa-DeCook); PTX-073-001 (2/10/10 internal Demmer email advising "we are not going to send AMG any labor information unless they become very demanding"); Tr. 905:12-24 (Tenlen).

**K.     The February 2010 Change Blanket Contracts and the Additional Note**

69.     At the February 4, 2010 meeting, Lentych advised Demmer that AM General wanted to put purchase orders in place to achieve the cost savings that were shown in Demmer's

December 2009 price proposal. Tr. 856:18-857:1 (Tenlen). Lentych further advised the Demmer representatives that because "finalization wouldn't be achieved" given the pending DCAA audit, "they [AM General] were going to put some note in the contract indicating that this audit was still ongoing for that reason." Tr. 856:18-857:13 (Tenlen). "It was just a brief statement, but it was enough that I [Tenlen] understood what he [Lentych] was saying, that we were here, we were looking—we were at the final innings of finishing up this contract, but there was this DCAA stuff coming in here that seemed to be standing in the way of everybody coming to an agreement[.]" Tr. 857:18-25 (Tenlen).

70.     Lentych advised Tenlen that AM General was "going to indicate a note on the PO indicating that this financial audit was still on going." Tr. 858:25-859:5 (Tenlen); *see also* 926:15-19 (Tenlen) ("Q. All right. Did they give you any impression as to whether the AMG folks wanted to keep their audit open as long as the DCAA was on the place? A. I believe that the DCAA involvement did create a factor in keeping the audit open."). Tenlen and the other Demmer personnel in attendance at the meeting reported to Demmer's CFO on the discussion of the purchase order change that AM General planned to issue. Tr. 719:5-9 (Shawa-DeCook).

71.     On or about February 12, 2010, AM General issued a Change Blanket Contract for each of the Bi-Metal Doors to Demmer (the "February 2010 Change Blanket Contracts"). The blanket contracts relating to the sale of the eight Bi-Metal Doors, with revisions through July 1, 2011, are contained in PTX-5. Stip. ¶ 9. Demmer's most recent price proposal included proposed Bi-Metal Door prices for 2010 that were significantly lower than the price AM General had been paying in 2009. PTX-78. The February 2010 Change Blanket Contracts also included language making them retroactive back to January 1, 2010: "Effective 1/01/2010 . . . Demmer Accounting Dept must contact AMG Accounting Dept to balance delivery payments from

23

1/01/2010." PTX-78-001; PTX-151; PTX-153; Stip. ¶27. In response to the retroactivity language in February 2010 Change Blanket Contracts, Demmer credited AM General for payments AM General made earlier in 2010 for Bi-Metal Doors that exceeded the prices included in the February 10, 2010 Change Blanket Contracts as modified by subsequent purchase order changes in 2010. PTX-151; PTX-153.

72.    Demmer retrieved the Change Blanket Contracts on February 15, 2010 by accessing them on AM General's web portal. Stip. ¶ 26.

73.    Demmer received the February 2010 Change Blanket Contracts, reviewed them, and accepted them in its internal system. Stip. ¶ 28.

74.    Upon receipt of the February 2010 Change Blanket Contracts, Demmer did not request that AM General delete the "Additional Notes" they contained. Stip. ¶ 31. Nor did anyone affiliated with Demmer contact AM General to object to the Note or seek any clarification of the Note's meaning. Tr. 353:25-354:5, 354:14-16 (Hodge); Tr. 420:13-421:17 (Lentych); PTX-197 (Sjoberg Dep.) 113:5-21.

75.    Tenlen retrieved and reviewed the Change Blanket Contracts when they arrived. Tr. 860:2-8 (Tenlen). He looked at the additional Note in the contract and it "didn't cause [him] great concern." Tr. 860:9-13 (Tenlen). The Note matched his understanding from the February 4, 2010 meeting: the words in the Note "might not have been the words that I chose, but I saw that they're making reference that the 2010 pricing—that there's an audit still going on. And I found it interesting but not over-concerning that they were wanting to secure themselves that, regardless of what the outcome of the audit was, that this latest proposal that Demmer provided, because Demmer proposed this, this would be the highest price that there could be, so I thought,

well, that was kind of creative on their part to establish that boundary." Tr. 860:12-861:7 (Tenlen)

76. The relevant language from the February 2010 Change Blanket Contracts is:

77. Demmer shipped the Bi-Metal Doors that AM General ordered pursuant to the February 2010 Change Blanket Contracts. Stip. ¶ 29.

| Item | Material | Description | Quantity | U/M | Net Price | PerUnit | Net Amount |
|------|----------|-------------|----------|-----|-----------|---------|------------|
| 13 | 6039324 | DOOR ASM-FRONT LEFT BI-METAL 100 | | EA | 3,482.34 | 1 | |

Revision level: T

Price change from $3,833.58 to $3,482.34 reflects 2010: AMG Aluminum Pricing Program status of DEC, 2009.
Effective 1/01/2010

Additional Notes:
2010 Pricing will be re-negotiated following completion of the Oct, 2009 AMG-Demmer Finance Audit results in cost breakdown changes.
However, any price re-negotiated will not exceed the Dec, 2009 pricing set within this contract revision.

Demmer Accounting Dept must contact AMG Accounting Dept to balance delivery payments from 1/01/2010.

78. Demmer invoiced AM General for Bi-Metal Doors at the prices stated in the February 2010 Change Blanket Contracts, subject to slight modifications for material changes during the year. Stip. ¶ 30.

79. The credible and persuasive evidence is that the February 2010 Change Blanket Contracts imposed open, non-settled, temporary, placeholder, ceiling, not-to-exceed prices that temporarily reduced the price of each part to match the price included in Demmer's December 2009 proposal for 2010 Bi-Metal Doors. Tr. 122:2-12, 123:10-22 (Peterson); Tr. 300:11-17 (McConville); Tr. 345:13-346:23 (Hodge); Tr. 403:19-25 (Lentych); Tr. 860:9-861:7 (Tenlen); Tr. 732:15-733:8 (Shawa-DeCook); PTX-162-002. In establishing the open, non-settled, temporary, placeholder, ceiling, not-to-exceed prices in the February 2010 Change Blanket Contracts, AM General relied upon the data that Demmer had provided in its December 2009

price proposal.  *See, e.g.*, Tr. 860:9-861:7 (Tenlen) (explaining that the December 2009 price proposal referenced in the Note came from Demmer).

80.    AM General Buyer Steve Hodge wrote the language used in the Additional Note relating to 2010 pricing (the "Note").  Tr. 349:5-14 (Hodge).  He sent the February 2010 Change Blanket Contracts to Demmer after the draft Note had been reviewed, revised, and approved by his supervisors and colleagues.  PTX-074-001, -006; PTX-075-001, -007; Tr. 122:13-22, 129:19-24, 130:24-132:22 (Peterson); Tr. 418:16-24, 419:9-21 (Lentych); Tr. 345:10-19, 346:24-347:5, 347:22-348:10, 349:5-350:14, 350:15-352:15 (Hodge); *see also* Tr. 270:17-271:4, 271:6-10 (McConville).

81.    The purpose of the language in the Note was to impose open, non-settled, temporary, placeholder, ceiling, not-to-exceed prices based on Demmer's most recent price proposal, which would be negotiated downward after AM General had completed its audit.  Tr. 122:2-12, 123:10-22 (Peterson); Tr. 269:24-270:4, 270:13-16 (McConville); Tr. 417:14-24, 419:6-21 (Lentych); Tr. 352:21-353:1 (Hodge); Tr. 974:3-9 (Plude).  As Tenlen described his expectation of what the Note would include, "this latest proposal that Demmer provided, that this was going to be the top of the line, because Demmer proposed this [price], this would be the highest price that there could be[.]"  Tr. 860:12-861:7 (Tenlen).

82.    The first sentence ("2010 pricing will be re-negotiated following completion of the Oct, 2009 AMG-Demmer Finance Audit results in cost breakdown changes") mandates a re-negotiation of Demmer's price proposal for 2010 Bi-Metal Doors at a specified time—completion of AM General's audit of Demmer.  Tr. 126:2-127:8 (Peterson); Tr. 419:15-19 (Lentych).  When AM General issued the February 2010 Change Blanket Contracts, the parties had exchanged some information and conducted some preliminary negotiations; thus,

although the parties had not yet agreed on 2010 pricing, they did negotiate and agree that the higher, 2009 prices would not carry over to 2010. Tr. 298:14-21 (McConville); Tr. 420:1-6 (Lentych). That explains the use of the term "re-negotiation" rather than negotiation. The reference to "cost breakdown changes" is a noun, and refers to Demmer's updated cost breakdown, which was submitted to AM General in October 2009 (and was the subject of the audit). Tr. 127:9-24, 128:2-4 (Peterson); Tr. 347:6-21 (Hodge). Demmer—like any other AM General supplier—had made changes to its cost breakdown. A cost breakdown change is not a product of an audit by AM General. Tr. 127:21-22 (Peterson); Tr. 269:12-23 (McConville); *see also* Tr. 127:6-8 (Peterson) ("So in there, we planned to renegotiate the 2010 pricing once we completed auditing those cost breakdown changes that Demmer provided to us."). There is no missing "if" (or any other words) in the first sentence. Tr. 127:25-128:1 (Peterson). If Demmer changed its cost breakdown again (as it had in October), then AM General "would have to audit those changes," Tr. 181:14-17 (Peterson), as well, and re-negotiate based on the results of that audit, *id.* at 180:20-25. *See also* Tr. 176:1-4 (Peterson) (2010 pricing would be renegotiated if there were cost breakdown changes during the audit). But AM General did not believe that was the only scenario in which pricing would change: AM General expected that the not-to-exceed pricing would change after completion of the audit, regardless of whether Demmer made further cost breakdown changes. *See* Tr. 182:11-183:3 (Peterson).

83.    The second sentence ("However, any price re-negotiated will not exceed the Dec. 2009 pricing set within this contract revision") refers to the December 2009 price proposal that Demmer submitted and makes the prices within that proposal the not-to-exceed price subject to subsequent, mandatory re-negotiation. Tr. 128:7-18 (Peterson); Tr. 300:11-17 (McConville); Tr. 417:21-24 (Lentych). The parties agreed to incorporate as a not-to-exceed price the December

2009 price proposal because that proposal was lower than the price AM General had been paying for Bi-Metal Doors in 2009.  *Id.*  In the words of Lentych, Demmer's December 2009 price proposal "null and voided" the price that AM General had been paying in 2009.  Tr. 418:11-15 (Lentych).

84.  AM General's choice of the phrase "will not exceed" was synonymous with "not-to-exceed" or "NTE."  The meaning was, "Not to exceed, will not exceed.  It [the price] wouldn't go any higher than the quote that they [Demmer] provided us [AM General] in 2009, December, but we [AM General] still have to go in and audit those cost changes that they [Demmer] presented to us."  Tr. 128:19-23 (Peterson); *accord id.* at 181:18-183:3, 188:21-189:3 (Peterson); Tr. 379:4-15 (Hodge); *see also id.* at 379:9-15 (Hodge) ("Q. Mr. Peterson told you to call these things 'NTE' prices back in February 2010? A. Correct. Q. Is there a reason you didn't use the phrase 'NTE' in the notes when you drafted them back in February 2010? A. No.  I used 'will not exceed.'  It means the same thing."); Tr. 264:8-13 (McConville) (explaining that no particular words are required to establish not-to-exceed pricing).

85.  There is no genuine dispute between the parties on this question.  As Demmer's CFO testified, "The additional note language had not-to-exceed, yes."  Tr. 731:15-18 (Shawa-DeCook); *see also* Tr. 677:7-8 (Shawa-DeCook) ("Q. Did you see the words 'not to exceed'? A. I seen it in the note . . . .").  This testimony is consistent with Demmer's internal documents during the course of performance.  *See* PTX-091-001 (Tenlen, "AMG also indicated that even though the audit was not closed, any additional changes to the prices would only be in one direction… less."); PTX-107-001 (Demmer's CFO was "trying to get ammo to prove our audit with AMG should be completed—therefore they can amend the PO's to take out the downward pricing."); PTX-114-001 (Shawa-DeCook asks Tenlen to "tell me which PO's have the

additional note regarding price audits not being finalized/etc."); PTX-120-001 (Shawa-DeCook to Tenlen, Koch, Dargitz, and Heppler, "For the part numbers with the NTE clause—I need to know which fall under the $700,000 threshold—those part numbers we will not be required to disclose current cost data."); PTX-129-001 (Demmer's Chief Accountant refers to the prices in the February 2010 Change Blanket Contracts as "submitted and accepted as NTE."); PTX-135-002 (Demmer's COO wanted to "dispute the NTE clause" and on 12/16/10 wrote detailed notes about his concerns that, "The NTE contract leaves <u>all</u> risk w. Demmer. There is only downward move."); PTX-142-001 (January 2011, Tenlen advises, "we are looking at the [new] contracts carefully to insure that the wording regarding the NTE pricing and the AMG/Demmer negotiations has been removed or superseded."); PTX-162-002 (June 2011 presentation prepared by Demmer's CFO that explained, in February 2010, "AMG amends Bi-Metal & Aluminum Stamping PO's to add a NTE clause."); PTX-178-001 (Tenlen and Shawa-DeCook exchange emails about the "POs with the NTE note on them"; Tenlen responds, "The February [2010] contracts had the NTE language on them[.]"); *see also* PTX-100-002 (internal Demmer document, "We from time to time receive orders that are POI's (Purchase Order of Intent) or NTE's (Not to Exceed) *or other such nomenclatures.  The commonality of these orders is that they will be subject to audit. . . .*  It is also important to understand that from the customer[']s perspective these orders are 'Not To Exceed'." (emphasis added)).

86.     In Shawa-DeCook's view, "do not exceed," "will not exceed," "not to exceed" is a single, common term.  Tr. 724:21-25 (Shawa-DeCook).  And as Tenlen, who reviewed and approved the contracts with the Note for Demmer, put it, the price set in the February 2010 Change Blanket Contracts was "the top of the line" and "the highest price that there could be." Tr. 860:12-861:7 (Tenlen).

**L.**     **Both Parties Understood the February 2010 Change Blanket Contracts To Impose Unsettled, Not-to-Exceed Pricing.**

87.    In addition to the conversation between the parties at the February 4, 2010 meeting and Demmer's contemporaneous understanding of the Note, AM General had additional interactions with Demmer that further confirmed the parties' understanding of the February 2010 Change Blanket Contracts.

88.    In a March 4, 2010 email exchange in which Demmer confirmed that AM General's audit would be on hold until the DCAA's audit of Demmer had closed, Lentych continued to ask Demmer for additional support for Demmer's proposed profit. Lentych advised, "This information is still needed and should not wait for DCAA to finish their audit. AMG does not agree with the 14% profit at the present time and will need data for Demmer to support the 14%. This will become an accounting nightmare if we prolong this as AMG will request a credit from the 01/01/10 Aluminum Program effectivity [sic] date if the profit is decreased from 14%." PTX-084-001; Tr. 403:2-9 (Lentych). Lentych's reminder about Demmer's price being reduced retroactively is consistent with the temporary, not-to-exceed pricing established in the February 2010 Change Blanket Contracts.

89.    On multiple occasions starting in late March or early April 2010, AM General's Peterson reminded Demmer's Tim Dargitz, that "we still had not finalized the pricing on those [Bi-Metal Door] contracts and they were still sitting out there." Tr. 133:11-135:3 (Peterson); *see also id.* at 134:13-14 ("I said, you know, 'Tim, we still have'—'We still have that price we've got to finalize on those contracts'"). Peterson's conversations with Dargitz were "that we had NTE pricing still out there." Tr. 180:4-10 (Peterson). Those conversations continued throughout 2010. *Id.* at 134:17-20.

90.     At no time did Dargitz disagree with Peterson, act confused, or claim that the prices in the February 2010 Change Blanket Contracts were final. Tr. 134:21-135:3 (Peterson).

91.     Anne McConville likewise spoke to Demmer's Shawa-DeCook about the status of 2010 pricing in November 2010. Tr. 275:14-276:2 (McConville). As she had in written contemporaneous correspondence, *see, e.g.*, PTX-118-001, DTX-BE-001 (which McConville drafted, *see* DTX-BD-001), McConville advised Shawa-DeCook that prices for 2010 were not-to-exceed and permitted AM General to reduce them after the results of an audit. Tr. 276:3-15 (McConville). Shawa-DeCook did not dispute those statements. *Id.* Nor did Shawa-DeCook contend that the prices AM General had been paying Demmer in 2010 were final or not subject to further negotiation. Tr. 276:16-22, 299:1-13 (McConville). Shawa-DeCook likewise did not take the position that the Note had put in place settled pricing that could not be changed. Tr. 276:23-277:1, 299:9-13 (McConville). Rather, Shawa-DeCook took the position that AM General should not use Demmer's actual costs to finalize 2010 prices. Tr. 277:2-14 (McConville).

92.     Throughout 2010, no one at Demmer claimed that the February 2010 Change Blanket Contracts established firm, fixed prices that could not be changed. Tr. 145:14-146:4 (Peterson); Tr. 354:20-23 (Hodge); Tr. 432:23-433:17 (Lentych).

**M.      From March through October 2010, Demmer Did Not Inform AM General that the DCAA Audit Was On Hold.**

93.     AM General reasonably relied on Demmer to inform AM General if DCAA put its audit of Demmer on hold. Tr. 404:14-22, 462:5-20 (Lentych). AM General had no reason to know when the DCAA would complete its work and the Supply Chain Management personnel involved in the Demmer supplier audit were not in regular contact with DCAA. Tr. 404:17-24 (Lentych); Tr. 973:7-15 (Plude). At that time, moreover, AM General's Supply Chain

Management and Contracts personnel did not believe that AM General could participate in a DCAA audit of an AM General supplier unless that supplier agreed to, and did, provide information about the audit directly to AM General. At Demmer's request, Plude apparently hoped to have AM General participate in the DCAA's audit of Demmer, but Rick Castelluccio (who was part of the department that interfaced with TACOM as opposed to suppliers, Tr. 930:14-19 (Castelluccio)), advised Plude that this was not possible. He informed Plude on January 14, 2010, "I know of no right/permission that we [AM General] could have any role in an Audit by DCAA. I have never heard of it, nor has Ali Wengrowski [of TACOM, *see* Tr. 935:24-25 (Castelluccio)]." DTX-AF-002. Castelluccio did advise that "there's no reason Demmer can't forward or cc us [AM General] on any questions raised by DCAA." DTX-AF-002.

94. No one from Demmer informed AM General that the DCAA's audit of Demmer was on hold. Tr. 702:10-13, 702:25-703:6 (Shawa-DeCook); PTX-192 (Dargitz Dep.) 183:21-24; PTX-193 (Heppler Dep.) 173:6-8 ("Q. To your knowledge was AM General notified that the DCAA audit had been put on hold? A. Not that I know of."); PTX-194 (McDonald Dep.) 56:16-24 ("Q. And so at that point you knew that the DCAA audit was on hold. A. Correct. Q. Did you then notify AM General that the DCAA audit was on hold? A. I did not. Q. To your knowledge did anyone else from Demmer notify AM General that the DCAA audit was on hold? A. I do not know."); PTX-197 (Sjoberg Dep.) 117:22-118:6; Tr. 425:7-14 (Lentych).

> 94.1 Although Demmer's CFO claimed that she assumed AM General somehow knew that the DCAA's audit of Demmer was on hold, she never checked. Tr. 702:5-9 (Shawa-DeCook). And she was not aware of anyone at Demmer telling anyone at AM General that the DCAA audit had been put on hold. Tr. 702:10-13, Tr. 702:25-703:6 (Shawa-DeCook). She could not "point to a single time where someone from Demmer told someone from AM General that the DCAA audit was put on hold." Tr. 703:15-18 (Shawa-DeCook).

94.2  In late January 2010, Shawa-DeCook wrote internally at Demmer that she wanted to "make sure AMG knows" that DCAA was conducting an audit of Demmer. PTX-063-001. This contemporaneous document suggests that Shawa-DeCook believed that Demmer needed to inform AM General of DCAA's audit of Demmer.

94.3  Shawa-DeCook had written communications with AM General in the days and weeks following February 12, 2010—after she learned the DCAA audit of Demmer was on hold. In those communications, AM General confirmed its understanding that AM General's own audit would be on hold until the DCAA audit was complete. *See* PTX-083-001; Tr. 700:1-23, 702:14-24 (Shawa-DeCook). Dargitz's recollection is no different. He testified that he understood that Demmer had asked that the AM General audit and negotiations be put on hold pending the DCAA audit; that the DCAA put its own audit on hold; and that he could not remember telling anyone at AM General that the DCAA audit was on hold. PTX-192 (Dargitz Dep.) 183:12-24.

94.4  Demmer's executives spoke to AM General's Plude by telephone on February 19, 2010—one week after the DCAA informed Demmer that the DCAA audit was on hold. PTX-081-001; PTX-193 (Heppler Dep.) 176:5-9. During that phone call, Demmer did not discuss with Plude the status of the DCAA's audit. PTX-192 (Dargitz Dep.) 143:15-144:8; PTX-193 (Heppler Dep.) 176:22-24.

95.  Through the fall of 2010, Demmer recognized that AM General's audit of its 2010 price proposal was on hold. *See* PTX-098-001 (9/8/10 internal Demmer email about the "DCAA Door Audit" noting that "AMG has not officially closed our audit yet"); PTX-099-001 (9/8/10 internal Demmer email, "I would think the only open issue would be our 2010 pricing that we submitted the data for."). Demmer's executives also believed that if AM General learned that the DCAA audit had been put on hold, then AM General would insist on moving forward with its own audit. PTX-192 (Dargitz Dep.) 143:15-144:22; PTX-081-001.

96.  Demmer has suggested that AM General should have known or must have known, that DCAA's audit of Demmer was on hold. The persuasive evidence does not support this contention. Rather, the record evidence supports AM General's claim that it was depending on Demmer to advise AM General of this issue. Tr. 404:14-24 (Lentych). Demmer, not DCAA,

informed AM General about the DCAA audit in the first place.  *See* DTX-AF-003 (1/13/10 Dargitz email to Plude advising of the DCAA's audit request).  Demmer, not DCAA, encouraged AM General to put its own audit on hold pending the outcome of the DCAA audit.  *See supra* ¶ 67.  And Demmer, not DCAA, responded to AM General's inquiries about the status of the DCAA audit.  *See supra* ¶¶ 67-68 & *infra* ¶ 97.

97.    In August 2010, AM General asked Demmer in writing about the status of the DCAA audit of Demmer:  "AM General knows the Government did an audit with Demmer, but we do not know the results of this audit."  PTX-095-002.  In response to this inquiry, Demmer still did not inform AM General that the DCAA's audit of Demmer was on hold.  Tr. 714:20-22, 717:5-20 (Shawa-DeCook); Tr. 910:14-16 (Tenlen).

98.    AM General's August 2010 inquiry came up as part of a broad record-updating exercise for an upcoming TACOM proposal.  As part of that effort, McConville (who is not assigned to suppliers, *see* Tr. 103:22-104:4 (Peterson)), inquired whether Demmer had supplied a certificate of cost or pricing data for its 2010 price proposal.  Tr. 272:25-274:24 (McConville); Tr. 355:9-24 (Hodge).  A certificate typically is not supplied until after the parties have reached agreement on price.  *See supra* ¶11.  In response to this inquiry, Demmer's personnel confirmed that "AMG had started auditing, then we were contacted by DCAA—Tom Bowden—so if I remember correctly AMG stopped" and that "even though the audit was not closed, any additional changes to the prices would only be in one direction . . . less."  PTX-091-001.  Demmer personnel confirmed that they "can't very well certify what hasn't been confirmed," or finalized.  PTX-093-001.  Tenlen explained internally, "It seems that AMG wants certified pricing but, because they have not closed the negotiations, they want the ability to revise prices if necessary."  *Id.*  When Tenlen received the inquiry, he "remembered this note that said they

wanted to renegotiate if there was any cost breakdown changes as a result of the audit, so that made me think of the audit. My immediate response back to Steve was that, 'So is the audit closed'?" Tr. 863:5-12 (Tenlen). Hodge responded, "No, it was not." Tr. 863:15-20 (Tenlen).

99. In response to AM General's August 2010 inquiry, no one at Demmer claimed that AM General and Demmer already had a final agreement on price. Tr. 713:7-10, 714:1-4 (Shawa-DeCook).

100. As part of this inquiry, Demmer's CFO advised Demmer's staff that she did not "want to awake DCAA," PTX-091-001, which had placed its audit of Demmer's 2010 price proposal on hold. Tr. 704:21-705:22 (Shawa-DeCook).

101. In response to the August 2010 inquiry about providing a certificate, Demmer did not provide a certificate for 2010 pricing. Tr. 274:12-17 (McConville); Tr. 355:21-24 (Hodge); Tr. 654:6-11 (Shawa-DeCook). Demmer never provided a certificate for 2010 pricing. Tr. 714:17-19 (Shawa-DeCook). Demmer did not provide a certificate for 2010 pricing in August 2010 because the parties had not agreed to final prices for 2010 at that time; therefore, no certificate was required. Tr. 274:18-275:2 (McConville); Tr. 355:25-356:5 (Hodge); PTX-195 (Roberts Dep.) 83:1-20 (Demmer's Roberts, "You can't certify pricing if negotiations are still open."), *id.* at 84:8-11 ("they were asking us to certify a price that hasn't been negotiated"). Had Demmer erroneously supplied a certificate at that time, AM General would have recognized the error and informed Demmer that no certificate was owed. Tr. 275:7-13 (McConville). Such a correction was unnecessary, as Demmer itself recognized that there had been no final agreement on price and therefore nothing to certify. PTX-195 (Roberts Dep.) 83:1-20, 84:8-11.

**N. In Late October 2010, AM General Learns that the DCAA Audit of Demmer Has Been Cancelled.**

102.     AM General did not learn the status of DCAA's audit of Demmer until late October 2010.  PTX-105-002; Tr. 120:9-16 (Peterson); Tr. 425:7-12 (Lentych).

103.     In late October 2010, DCAA advised AM General that the DCAA was cancelling its audit of Demmer's 2010 price proposal.  PTX-105-002.   In the same document, AM General's Castelluccio asked the Supply Chain Management department about the Demmer contract.  Castelluccio's email—which was internal to AM General—does not indicate whether he thought the purchase orders with "price revisions" in place at Demmer were NTE or firm-fixed.  *See* PTX-105-001.   Demmer's suggestion, through questioning, that Castelluccio was "incorrect" on the status of the contract with Demmer is misguided.  *See* Tr. 314:1-19 (McConville).  As Castelluccio credibly testified at trial, his recollection was that "any POs that were in place with Demmer were NTEs, as far as I knew.  Even when they were change orders, they were not-to-exceed numbers."  Tr. 941:23-942:5 (Castelluccio).  His boss had the same understanding.  PTX-203 (Daniels Dep.) 92:18-93:1 ("I don't recall any time when it [the pricing in the February 2010 Change Blanket Contracts] wasn't referred to as not-to-exceed pricing.").

103.1   Shortly thereafter, Supply Chain Management confirmed to Castelluccio that the purchase orders in place with Demmer at that time were "NTE prices, initially established to support the 2009, 2010 to 2013 proposal effort.  Although that effort was never placed on contract (at the prime level), AMG was able to negotiate NTEs with Demmer for each of the door parts.  (NTEs have subsequently been updated to reflect changes in insulation.)  AMG disclosed the NTE prices, as well as Demmer's readily available cost or pricing data, on Disk One of our proposal backup. . . ."  DTX-BF-001; Tr. 329:19-333:18 (McConville).  McConville drafted the email and Plude reviewed and approved its release to Castelluccio.  Tr. 333:7-12 (McConville); DTX-BG-001.

103.2   On November 5, 2010, Castelluccio promptly provided that information to TACOM and DCAA.  DTX-BH-001.  Demmer's contrary suggestion—that AM General informed TACOM that AM General had firm fixed prices with Demmer, *see, e.g.*, Tr. 309:5-20 (Demmer counsel)—is contradicted by the record evidence.

104. In response to learning that the DCAA audit had been cancelled, on November 2, 2010, AM General contacted Demmer to complete AM General's audit and negotiate and settle prices for 2010. PTX-108-001. This request was consistent with Demmer's expectation that AM General would seek to complete its audit once it learned that DCAA had finished its work. *See supra* ¶95. In a written inquiry to Demmer about this issue, AM General again reminded Demmer that "[c]urrent purchase order prices for 'Demmer Doors' are based on NTE's which have not yet been finalized." *Id.*

105. In response to AM General's inquiry, no one affiliated with Demmer objected to the reference to the February 2010 Change Blanket Contracts as NTE's that had not yet been finalized. Tr. 420:16-421:3 (Lentych). Nor did anyone from Demmer contend that the February 2010 Change Blanket Contracts established settled prices that could not be reduced in the future.

106. Instead, Demmer looked for "ammo to prove our audit with AMG should be completed—therefore they can amend the PO's to take out the downward pricing." PTX-104-001. That is how Shawa-DeCook viewed the Note in the February 2010 Change Blanket Contracts—allowing for "downward pricing." Tr. 727:11-18 (Shawa-DeCook). As part of this effort, Shawa-DeCook wrote to DCAA, "Also, can you shed some light on what if anything this means, as far as the cancellation at this time? Cancelled based on AMG's audit being sufficient/finalized or another reason?" PTX-106-001. When Shawa-DeCook circulated a draft of this email internally at Demmer on October 25, 2010, Tenlen advised, "I agree that the last two sentences [quoted from her email to DCAA] could open the door for us to close out with AMG." PTX-107-001. There is no record evidence, however, that DCAA responded affirmatively to Shawa-DeCook's request for confirmation that "AMG's audit [was] sufficient/finalized." PTX-106-001.

107.     By this time, November of 2010, Shawa-DeCook had seen the February 2010 Change Blanket Contracts.  Tr. 728:5-13 (Shawa-DeCook).  She wanted to take out the downward pricing because she wanted AM General to remove the Note in those purchase order changes.  Tr. 728:14-18 (Shawa-DeCook).  Subsequently, when she corresponded with her colleagues at Demmer, she referred to the February 2010 purchase order changes as being NTEs. Tr. 728:19-22 (Shawa-DeCook).

108.     Once AM General learned that DCAA had cancelled its audit of Demmer's proposal for 2010 pricing, AM General re-initiated its own audit efforts.  Tr. 120:17-22 (Peterson); Tr. 425:15-18 (Lentych); DTX-BE-001 (11/2/10 email from Hodge to Demmer advising that current prices are "NTE's which have not yet been finalized" and "Both Todd Lentych and I intend to visit Demmer within the next week in order to negotiate and finalize pricing.  In support of the negotiations, please provide any updated cost or pricing data by Friday, November 5, 2010.").  Demmer did not provide information in response to AM General's request.  Tr. 466:1-4 (Lentych).

### O.     The November 18, 2010 Meeting Did Not Result in Final, Settled 2010 Prices.

109.     On November 18, 2010, AM General representatives Stephen Hodge and Todd Lentych traveled to Demmer's facilities in Lansing, Michigan.  Stip. ¶ 33.

110.     The purpose of the meeting was to continue auditing Demmer's proposal for 2010 pricing, as well as to support 2011 pricing efforts.  Tr. 140:22-25 (Peterson); Tr. 356:9-13 (Hodge); Tr. 426:14-18 (Lentych); Tr. 976:21-977:5 (Plude).  AM General's own audit needed to be resumed at this point because AM General had recently learned the DCAA had cancelled its audit of Demmer.  Tr. 120:17-22 (Peterson); Tr. 425:15-18 (Lentych).

111.    At the November 18, 2010 meeting, AM General representatives Stephen Hodge and Todd Lentych were presented with a letter, signed by Demmer's Tim Dargitz, that would have set the final 2010 door price at $3,482.34 (the NTE price) and would have "terminate[d] the additional notes on [the February 2010 Change Blanket Contracts]" and "conclude[d] any re-negotiation and/or retroactive pricing for 2010 deliveries."  PTX-117-001.

112.    Hodge and Lentych declined to sign the letter at the meeting.  No one affiliated with AM General ever signed the letter.  PTX-117; Tr. 141:1-14 (Peterson); Tr. 357:16-358:4 (Hodge); Tr. 427:22-428:6 (Lentych); Tr. 722:18-22 (Shawa-DeCook); Tr. 866:15-18, 867:7-16 (Tenlen).

113.    No one at AM General agreed with the content of the letter that Demmer presented to Hodge and Lentych at the November 18, 2010 meeting.  Tr. 141:15-25 (Peterson); 358:1-11 (Hodge); Tr. 428:5-16, 429:6-21 (Lentych).  Demmer personnel claim that someone from AM General indicated that 2010 pricing was "closed" or "behind us" around the time of this meeting (something AM General personnel dispute, *see* Tr. 356:16-357:15 (Hodge), Tr. 427:5-21 (Lentych), Tr. 977:6-16 (Plude)).  But the parties agree that AM General never signed the letter or removed the Note from the February 2010 Change Blanket Contracts.  Tr. 669:20 ("THE COURT:  They refused to sign it."); Tr. 141:9-16 (Peterson); Tr. 358:12-18 (Hodge); Tr. 427:22-428:6 (Lentych); Tr. 722:18-22 (Shawa-DeCook); Tr. 866:15-18, 867:7-16 (Tenlen).  Furthermore, Demmer itself wrote AM General on November 23, 2010—just a few days after the meeting—to confirm that "AMG stands [sic] that 2010 is open for negotiations."  DTX-BM-001; Tr. 723:3-20 (Shawa-DeCook).  Accordingly, at most, Demmer's evidence on this point (undocumented, self-serving recollections from two Demmer representatives and a self-serving

note drafted by one of them, DTX-BL) indicates that there was an immaterial miscommunication between the parties.

114.    More importantly, as shown by the November 18, 2010 letter (PTX-117), Demmer acknowledged that the Note established open, non-settled, temporary, placeholder, ceiling, not-to-exceed prices.  *See also* Tr. 427:22-428:16 (Lentych).  If Demmer believed at that time that the February 2010 Change Blanket Contracts put in place settled, rather than open, NTE pricing, there would have been no need to present AM General with the letter.

115.    Similarly, Tenlen's view as of November 18, 2010, was that the issue of 2010 pricing had "been festering for several months and never had ultimate closure."  Tr. 866:8-14 (Tenlen).  If Tenlen and his colleagues at Demmer had believed that the February 2010 Change Blanket Contracts established settled, final prices, he would not have had such a concern.  *See also* PTX-192 (Dargitz Dep.) 182:18-183:24 (explaining that he was frustrated in November 2010 that the parties were "two thirds of the way through the year and we can't seem to come to closure").

**P.    The December 7-8, 2010 Meeting Did Not Result in Settled, Final 2010 Prices.**

116.    On December 7 and 8, 2010, AM General representatives Stephen Hodge, Anne McConville, Brian Peterson, and Don Plude attended a meeting at Demmer's facilities in Lansing, Michigan.  AM General representative Todd Lentych attended the first day of this two-day meeting.  Demmer was represented at the meeting by Timothy Dargitz, Heather Shawa-DeCook, Matt Heppler, and Sten Sjoberg.  The parties discussed pricing for Bi-Metal Doors for 2010 and 2011, and Demmer provided AM General with certain data, then available from Demmer's accounting system, pertaining to Demmer's costs of production for Bi-Metal Doors delivered to AM General during a portion of 2010.  Stip. ¶ 34.

117. During the December 7 and 8, 2010 meetings, no one affiliated with Demmer contended that the February 2010 Change Blanket Contracts established settled prices that could not be reduced in the future. Tr. 145:14-146:4 (Peterson); Tr. 281:17-20, 281:24-282:1 (McConville); Tr. 432:23-24, 433:8-17 (Lentych). Nor did anyone affiliated with Demmer challenge AM General's characterization of the 2010 prices for Bi-Metal Doors as open. *Id.* Indeed, in a PowerPoint presentation prepared and used by Demmer during the meeting, Demmer itself acknowledged on an "AMG Timeline" for 2010, "Open ended PO's received—still in negotiations throughout the year." PTX-123-004; *see also* PTX-193 (Heppler Dep.) 193:20-24, 194:21-25 (testifying that PTX-123 was used at the December 7, 2010 meeting).

118. Rather than disputing that the February 2010 Change Blanket Contracts set not-to-exceed pricing, the parties disputed what information could or should be used to settle or "definitize"[5] the open 2010 prices. AM General wanted to use Demmer's actual cost data from 2010; Demmer did not. Tr. 144:18-145:7 (Peterson); Tr. 277:15-19 (McConville); Tr. 430:14-19, 432:4-9, 432:13-22 (Lentych); Tr. 661:19-25 (Shawa-DeCook).

> 118.1 The actual cost data would show the true cost of building the door and are easier to use in determining fair and reasonable pricing. Tr. 144:22-145:5 (Peterson); Tr. 430:20-431:3 (Lentych).
>
> 118.2 As of December 2010, AM General was not in a position to ignore Demmer's actual cost data. Tr. 145:8-13 (Peterson); Tr. 277:15-278:20, 279:14-22 (McConville). As McConville credibly explained at trial, AM General had to certify its own cost or pricing data as "current, accurate, and complete. We're required to flow that [requirement] down to our subcontractors, and we have no authority to waive that requirement." Tr. 277:24-278:4; *see also id.* at 277:15-19 (McConville); Tr. 430:20-431:6 (Lentych); *accord* Tr. 974:10-975:1 (Plude). Because AM General was

---

[5] "Definitize" is a term the parties used to mean settle or finalize the prices. *See* Tr. 121:1-5 (Peterson); PTX-168-001 (handwritten notes of Demmer's COO, under "AMG" "Definitization of 2010"); PTX-169-001 (same); PTX-171-001 (handwritten notes of Demmer's COO, "AMG—Definitization 2010"); Tr. 974:15-20 (Plude). The term is commonly used in the defense industry. *See* Tr. 532:11-13 (Bingham).

> still attempting to finalize the 2010 prices, it had to consult Demmer's *current*—in this case, actual—cost data to finalize the prices. *See also* Tr. 538:1-5 (Bingham).

118.3 Internally, Demmer acknowledged that it had to provide the 2010 actual cost data. On December 1, 2010, Sjoberg asked Shawa-DeCook, "Did we reply to AMG on their request for cost information for 2010?" PTX-119-002. Shawa-DeCook responded, "We have no room not to comply and will have a hard negotiation now until next week . . . . We've got our continued plan and also working on putting our efficiency gains into hours to justify. We just need to sell/show that it's not as simple as using actual alone. There's [sic] bigger risks longer term also that we need to end this and not keep open." PTX-119-001; *see also* PTX-128-001 (Sjoberg handwritten notes dated 12/7/10, "We can justify the gap from 14.5 hrs $\rightarrow$ 7.1 due to efficiencies").

119. Using actual data was also consistent with government contracting practice. McConville, for example, had always used up-to-date, actual costs in resolving not-to-exceed pricing in the past. Tr. 279:3-7 (McConville); PTX-118-001 (11/30/10 McConville email to Demmer, "In my experience, finalizing NTE prices has been straightforward as both parties have the benefit of working with actuals.").

120. If AM General had not considered Demmer's actual costs in 2010 in attempting to finalize 2010 pricing, AM General faced the risk that the Government would not reimburse AM General for any difference between the agreed-upon costs and the actual costs. Tr. 279:23-280:6 (McConville).

121. This risk applied even if the government cancelled the RFP to AM General for 2010-2013 and carried over 2009 HMMWV prices to 2010. Tr. 280:7-10 (McConville).

122. This risk applied even if the Government was not seeking cost or pricing data from AM General for 2010 HMMWV prices. Tr. 280:15-18 (McConville). At some point in the future, the Government could require such a certification. Tr. 280:15-25 (McConville). Indeed, as it turned out, down the road—in 2011—the Government did request, and AM General

submitted, certified cost or pricing data for 2010 Bi-Metal Door prices. PTX-175-001–002. AM General did so in connection with the Bi-Metal Door Value Engineering Change Proposal ("VECP"). PTX-175-002. *See infra* ¶185.4.

123. Additionally, during the December 7, 2010 meeting, Demmer executive Heppler gave a presentation about improvements and efficiencies that Demmer had made to the door line; Heppler, however would not state expressly when those improvements had been made. Tr. 142:1-6, 142:20-143:18 (Peterson); Tr. 282:6-16 (McConville); Tr. 431:7-13 (Lentych). In the middle of Heppler's presentation, Demmer's other representatives stopped the meeting. Tr. 143:19-144:1 (Peterson); Tr. 282:21-283:2 (McConville); Tr. 431:14-25 (Lentych). Heppler did not return to the meeting, and Demmer's remaining personnel claimed not to be able to answer AM General's outstanding questions about the labor improvements. Tr. 143:19-144:14 (Peterson); Tr. 283:3-8 (McConville). This information was relevant to AM General's audit because if Demmer had put efficiencies in place before 2010, it meant that AM General had been overpaying substantially for the Bi-Metal Doors. Tr. 143:9-18 (Peterson); Tr. 282:13-20 (McConville).

124. Heppler testified that the various process improvements he identified at the December 2010 meeting were put in place before 2010. PTX-193 (Heppler Dep.) 194:21-25, 208:6-17, 209:5-13, 209:19-210:17, 219:12-220:8, 231:20-232:17.

## Q. Demmer's 2011 Submission and Certification of Cost or Pricing Data

125. On January 7, 2011, Demmer certified that the cost or pricing data it furnished to AM General in support of Demmer's price proposal for 2011 shipments of Bi-Metal Doors were current, accurate, and complete. Stip. ¶ 35; Tr. 271:19-272:17 (McConville); Tr. 678:3-7 (Shawa-DeCook); PTX-140-004.

126. By contrast, Demmer never submitted a certificate of cost or pricing data for 2010. Tr. 272:20-22 (McConville); Tr. 355:21-24 (Hodge); Tr. 714:17-19 (Shawa-DeCook). Demmer did not certify the cost or pricing data associated with the 2010 price proposal because the parties never reached final agreement on prices for Bi-Metal Doors shipped in 2010. Tr. 272:23-24 (McConville); Tr. 355:25-356:5 (Hodge); Tr. 405:3-4, 403:10-18 (Lentych).

127. On February 16, 2011, at AM General's request, Demmer resubmitted its cost and pricing data in support of its price proposal for 2011 shipments of Bi-Metal Doors in the format prescribed by FAR 15-2. Stip. ¶ 36.

**R.     The DCAA Audit Report and Demmer's 2010 Actual Costs**

128. On May 27, 2011, the DCAA issued Audit Report No. 2261-2011F 2100 004, PTX-6. The Audit Report summarized DCAA's findings of its audit of Demmer's January 7, 2011 price proposal for Bi-Metal Doors. Stip. ¶ 37.

129. As part of the audit, the DCAA examined the actual costs that Demmer incurred in producing Bi-Metal Doors in 2010. DTX-006-004, -005, -010, -011, -022; Tr. 536:18-537:2 (Bingham). Demmer's retained witness, Stephen Kiraly, whom Demmer did not attempt to qualify as an expert, suggested in response to questions from the Court that the DCAA was not looking at Demmer's actual costs. Tr. 761:19-21 (Kiraly). The plain language of the relevant audit report confirms that Demmer's 2010 actual costs were, in fact, evaluated. DTX-006-004, -005, -010, -011, -022; *see also* PTX-203 (Daniels Dep.) 248:2-11 (DCAA "audited Demmer's 2010 actual costs"). Kiraly's suggestion also contradicts Demmer's own COO's representation about the DCAA Audit Report. *See* PTX-164-002 ("In addition, the DCAA audit report also indicates that the auditors examined Demmer's costs through December 2010."). After being asked to clarify his comments by Demmer's counsel, moreover, Kiraly acknowledged that he

"would have expected" DCAA to review Demmer's actual costs as part of the audit work. Tr. 761:23-25 (Kiraly).

130. The DCAA questioned $545,462 of the costs Demmer proposed in connection with the 2011 proposal. PTX-6-007.

131. Demmer's actual costs of producing the Bi-Metal Doors it shipped to AM General in 2010 were $2,058.10 per door for the front doors and $2,107.22 per door for the rear doors. PTX-145.

132. Demmer's actual costs of producing the Bi-Metal Doors shipped to AM General in 2010 that were unquestioned by the DCAA were $2,017.58 per door for the front doors and $2,067.00 per door for the rear doors. Tr. 537:16-25 (Bingham); PTX-006-004 (stating quantities); PTX-006-008; PTX-006-017–019.

**S.** **AM General's Withholding and Pre-Litigation Negotiations**

133. Beginning in December 2010, AM General began withholding amounts from payments to Demmer. AM General did so to begin to offset the amount it had overpaid Demmer for Bi-Metal Doors delivered in 2010. PTX-177. The withholding began after the December 7-8, 2010 meeting. Tr. 146:5-14 (Peterson).

134. In total, AM General withheld $19,366,810.09 from Demmer from payments for parts sent to AM General's production facility in late 2010 and early 2011. PTX-177-010.

135. The DCAA Audit Report revealed that the 2010 actual cost data Demmer had provided in support of its 2011 price proposal were inaccurate and incomplete, and had included disallowed and unsupported costs. PTX-6.

136.    In late June 2011, AM General issued new Blanket Contracts to Demmer lowering the price of Bi-Metal Doors, effective July 1, 2011.  The new prices in the Blanket Contracts were based on the results of the DCAA Audit Report.  PTX-5.

137.    In 2011, AM General and Demmer exchanged letters in an attempt to resolve their dispute over 2010 Bi-Metal Door pricing.  One of those letters was a September 9, 2011 letter that AM General referred to as its "final decision."  Stip. ¶ 39.

138.    AM General issued the Final Decision letter (PTX-174) pursuant to Clause 24 of the terms and conditions.  In that letter, AM General advised that its interpretation of the contract required the parties to negotiate final 2010 pricing using Demmer's 2010 actual, allowable costs[6] plus a reasonable profit rate for a total of $48,808,361.23 less than the amounts that Demmer had invoiced AM General using the NTE pricing.  This amount included refunds for parts other than the Bi-Metal Doors.  PTX-174.

139.    In response to the Final Decision letter, Demmer did not pay AM General any of the requested funds or drop its request for reimbursement of the funds that AM General had already withheld.  *See* Stip. ¶ 39.

140.    AM General was never able to complete its audit of Demmer's proposal for 2010 prices on Bi-Metal Doors.  Tr. 114:24-115:4, 159:16-18 (Peterson); Tr. 355:25-356:2 (Hodge); *see also* Tr. 903:18-20 (Tenlen) ("Q. And so nobody ever told you, between March and August of 2010, that the AM General audit had been closed, correct? A. That is right.").

141.    At no time have the parties agreed upon settled prices for 2010 shipments of Bi-Metal Doors.  Tr. 144:15-17 (Peterson); Tr. 272:20-24, 283:19-25 (McConville); Tr. 433:15-17 (Lentych); Tr. 358:1-11 (Hodge).

---

[6] "Allowable" costs are the contractor's costs that the government is permitted to reimburse.  Tr. 264:23-265:5 (McConville).  The government is not permitted to reimburse unallowable costs, either to contractors or subcontractors.  Tr. 265:12-17 (McConville).

142.    As the parties' dispute wore on, Demmer threatened to stop production if AM General did not acquiesce to Demmer's position on 2011 pricing.  *See* PTX-172-009.

**T.    Additional Course of Dealing and Course of Performance Evidence**

143.    In addition to the evidence and findings set out above, other evidence about the parties' course of dealing and course of performance further supports AM General's position.

144.    In 2007, the parties used not-to-exceed pricing.  The only difference between the 2007 NTE contract and the Note in the February 2010 Change Blanket Contracts is a slight, immaterial change in wording.  In particular, the 2007 contract used the phrase "Not To Exceed" whereas the February 2010 Change Blanket Contracts used the phrase "will not exceed."  The Court concludes that this is a distinction without a difference and that all parties to the contract understood the meaning of the "not to exceed" term.

145.    Not one Demmer witness testified that he or she had even seen the 2007 not-to-exceed purchase orders in assessing the meaning of the February 2010 Change Blanket Contracts.  Nor did any testimony or any document in evidence suggest that anyone at Demmer compared the February 2010 Change Blanket Contracts to the 2007 purchase order to identify differences, drew any different conclusion from one document to the next, or had the 2007 purchase order experience in mind when considering the February 2010 Change Blanket Contracts.  No testimony or document in evidence in any way suggests that Demmer personnel viewed "NOT TO EXCEED" as a talisman that had to be invoked to establish not-to-exceed pricing.  The persuasive evidence shows the opposite. *See* FoF ¶¶13-14, 74-75, 81, 85-86.

146.    In 2007, after AM General and Demmer settled the prices that had initially been established as not-to-exceed, AM General issued a revision to the blanket contract that removed the not-to-exceed limitation.  *See* PTX-007-008 ("EFFECTIVE 8/10/07, CHANGE PRICE ON

ORDER TO READ AS FOLLOWS. (NOT TO EXCEED REMOVED)").  In contrast, the Note in the February 2010 Change Blanket Contracts was never removed.  Instead, AM General issued a reminder that the not-to-exceed prices remained open and undefinitized into 2011.  In early 2011, AM General added the following notation on the relevant blanket contracts: "NTE prices for shipments from 01/01/10 to 01/01/11 are unchanged by this action and remain subject to downward adjustment based on applicable cost or pricing data."  DTX-CB-005.  Demmer continued to ship Bi-Metal Doors to AM General after receiving the updated blanket contracts with this notation.  There is no record evidence that Demmer objected to this language.

147.    AM General typically issued change blanket contracts for all contractual changes, including price changes.  The parties changed prices on numerous occasions without including any of the language in the Note.  *See, e.g.*, Tr. 269:4-6 (McConville); PTX-090-002; Tr. 410:1-13 (Lentych).  The words in the Note reflected an approach to changing the price that differed from simply replacing an old settled price with a new settled price.  The Note reflected the parties' intent to keep the prices unsettled and open pending completion of AM General's audit and negotiations.

148.    Demmer's internal, pre-litigation documents are replete with references to the February 2010 Change Blanket Contracts as "NTEs."  *See* PTX-142-001 ("we are looking at the contracts carefully to insure that the wording regarding the NTE pricing and the AMG/Demmer negotiations has been removed or superseded"); PTX-162-002 (internal Demmer PowerPoint presentation describing history with AM General, including the following entry for February 2010:  "AMG amends Bi-Metal & Aluminum Stamping PO's to add a NTE clause"); PTX-129-001 (internal Demmer email explaining that the 2010 price "was submitted and accepted as NTE"); PTX-160-004, -006, -008 (calculating the difference between Demmer's actuals and the

"NTE Price" in internal accounting documents); PTX-161-004, -006 (same); *see also supra* ¶ 85 (collecting additional internal Demmer communications). These communications confirm Demmer's understanding of the Note's meaning. Further, Ms. Shawa-DeCook confirmed at trial that the "NTE note," "NTE language," "NTE clause," in PTX-178, PTX-120, and PTX-162, all referred to the additional Note in the February 2010 Change Blanket Contracts. *See* Tr. 728:25-733:8 (Shawa-DeCook).

149. At trial, both Heather Shawa-DeCook and Karl Tenlen suggested that these many internal references to the Note in the February 2010 Change Blanket Contracts were applications of a "label" or "shorthand reference" that AM General's own correspondence referenced. Tr. 673:14-20 (Shawa-DeCook); Tr. 916:12-19 (Tenlen). Shawa-DeCook testified that these references did not mean that Demmer agreed with AM General's position. Tr. 673:21-23 (Shawa-DeCook). Not one internal Demmer document supports this testimony. Moreover, none of the communications in which Shawa-DeCook and Tenlen use this terminology contemporaneously record that it was only AM General's view of the contract. Furthermore, neither of these individuals wrote—in any document in evidence, even those sent to AM General in the run up to the litigation (*see infra* ¶¶154-155)—that they believed the prices were settled and final, rather than open and "NTE."

150. Additionally, none of the other Demmer executives involved in these communications—such as Dargitz, Koch-McDonald, or Sjoberg—testified that they were merely repeating something they had heard late-in-time from AM General. Most of Sjoberg's many references were in his handwritten notes, which he testified he did not share with anyone, including within the company. PTX-197 (Sjoberg Dep.) 44:22-46:17.

151.    In addition to Demmer's internal communications, Demmer had a number of interactions with AM General in which Demmer did not object to AM General's reference to the February 2010 Change Blanket Contracts as not-to-exceed or NTE.

152.    In November 2010, for example, AM General wrote to Demmer on multiple occasions and referred to the February 2010 Change Blanket Contracts explicitly as "NTE's which have not yet been finalized."  DTX-BE-001.  Demmer wrote back in response, but did not object to the NTE terminology or argue that the prices were firm and fixed.  *See* PTX-118-003 (11/23/10 email from Dargitz); PTX-118-001 (11/30/10 email from Shawa-DeCook); Tr. 426:2-11 (Lentych); PTX-192 (Dargitz Dep.) 159:24-160:14.  Rather, Demmer argued about what type of information AM General should use in settling, or definitizing, the 2010 prices.

153.    On December 9, 2010, Tenlen wrote Hodge in response to an inquiry about 2011 pricing.  Tenlen wrote, "Before I submit the updated pricing to AMG, I understand that we must first close the pricing negotiations for 2010."  PTX-130-001.  If Tenlen believed that 2010 prices were closed and final, he would not have made this request.  (The parties did not, however, close such negotiations—as indicated by subsequent communications.  *See, e.g.*, PTX-137-002, PTX-163-001.)

154.    On December 22, 2010, Sjoberg wrote Plude about a December 17, 2010 meeting in which the participants, including Demmer's President and CEO, "discuss[ed] ways to resolve the issues between AM General and Demmer that have prevented realizing a final agreement on pricing for 2010 under our HMMWV contract."  PTX-137-001.  Nowhere in the letter does Demmer contend that 2010 pricing was settled or closed; nor does Demmer dispute that the parties had NTE prices for 2010.  *See also* PTX-164-001 (6/16/11 letter from Demmer re: "Definitization of 2010 Not To Exceed (NTE) Pricing" and taking the position that Demmer's

various "definitization proposal[s]" were accepted "in practice" by AM General, but not arguing that the February 2010 Change Blanket Contracts established final prices).

155.    In March 2011, AM General and Demmer resolved an accounting discrepancy on the prices AM General had been paying for the Bi-Metal Doors.  Lentych emailed Demmer representatives, including Shawa-DeCook, about this issue and referred to the 2010 prices for Bi-Metal Doors as "Not To Exceed ('NTE') prices."  PTX-150-001.  Shawa-DeCook did not dispute Lentych's characterization of the prices as NTE in response.  Tr. 423:11-14 (Lentych). Several Demmer representatives reviewed and analyzed Lentych's message; none of them disputed the characterization of the 2010 prices as NTE, either.  *See* PTX-151-001–002.  Shawa-DeCook also wrote in response to Lentych's email and confirmed that the calculations AM General had performed were correct; she did not dispute the NTE reference.  PTX-152-001. Demmer replied to AM General and identified the "credits and invoices for the 2010 contracted not to exceed amount."  PTX-153-001.  Those credit memos referenced the amounts owed as, "2010 NOT TO EXCEED OVERPAYMENT."  PTX-153-001; *see also* PTX-153-002–107 (describing "2010 NOT TO EXCEED OVERPAY").

U.    Trade Usage Evidence

156.    Trade usage also supports AM General's position.  In the field of government contracting and subcontracting it is customary for contracting parties to use open, non-settled, temporary, placeholder, ceiling, not-to-exceed prices to permit performance while the parties complete audits and negotiate final, settled prices.  Tr. 263:22-264:4 (McConville); 527:14-528:12 (Bingham).

157.    AM General has previously used not-to-exceed pricing with Demmer and other suppliers.  AM General previously used not-to-exceed pricing in purchase orders with BAE

Systems.  *See* PTX-007-001, DTX-CY–DTX-DA.  Those purchase orders used a variety of different terms to establish not-to-exceed pricing:  "NOT TO EXCEED," PTX-007-001; "ALL PRICES ARE 'NOT TO EXCEED', 'SUBJECT TO AUDIT & NEGOTIATION,'" DTX-CY-001; "EFFECTIVE 4-1-05, CHANGE PRICE FROM $.01 TO $38.75 AS A 'NOT TO EXCEED'," DTX-CX-005; "REASON FOR CHANGE: TO ESTABLISH A 'NOT TO EXCEED' PRICE," *id.*; "ALL PRICES ARE 'NOT TO EXCEED' AND ARE 'SUBJECT TO AUDIT' AND FINAL NEGOTIATIONS," DTX-CZ-001; "NOTE:  ALL PRICES ARE 'NOT TO EXCEED' AND 'SUBJECT TO AUDIT AND NEGOTIATIONS'," DTX-DA-001, DTX-DA-008; "1) PRICES ARE 'NTE' BASED ON SIMILAR PARTS.  2) PRICES WILL BE CHANGED WHEN A FFP PRICE IS SUBMITTED TO AMG," DTX-DA-018.

158.    Demmer has argued that a regulatory provision on undefinitized contract actions from the DFARS should have been used if AM General sought to impose not-to-exceed pricing.  The Court disagrees.

> 158.1  AM General and Demmer did not incorporate the DFARS provision on undefinitized contract actions into the February 2010 Change Blanket Contracts.  *See generally* PTX-3; Tr. 532:14-16 (Bingham); *see also id.* at 594:6-595:4 (Bingham) (confirming that limitations on the duration of an undefinitized contract action, amounts that may be withheld, and profit that may be in the DFARS provision on undefinitized contract actions are not in the February 2010 Change Blanket Contracts).  There was no requirement that the parties incorporate that provision in their subcontract.  Tr. 532:17-19 (Bingham).

> 158.2  Similarly, in 2007, AM General and Demmer did not incorporate the DFARS provision on undefinitized contract actions in the purchase order that implemented what even Demmer agrees was "not-to-exceed" pricing.  *See* PTX-007-004 & PTX-190, PTX-191 (the terms and conditions incorporated into PTX-7, which do not include the UCA provisions).  The parties' decision not to incorporate that DFARS provision did not prevent them from establishing not-to-exceed pricing in 2007 or in 2010.  *See* Tr. 532:20-533:3 (Bingham).

158.3  Likewise, the terms and conditions that were incorporated into the AM General-BAE purchase orders did not incorporate the DFARS provisions on undefinitized contract actions. *See generally* PTX-189. The parties' decision not to incorporate that particular procedure did not keep them from entering into not-to-exceed prices—a point that Demmer concedes by citing those other purchase orders as valid examples of not-to-exceed, open pricing under UCC § 305. *See* Demmer Trial Br. (D.E. 156) ("Demmer T.B.") at 8-10.

159.    AM General also used not-to-exceed pricing with Armor Works (another supplier to AM General's HMMWV program). Tr. 214:7-13 (Mills). In that situation, after DCAA audited Armor Works' cost or pricing data, Armor Works agreed to re-negotiate the NTE price down several thousand dollars. Tr. 214:14-22 (Mills). The downward adjustment in the NTE price took place "over a year past the start date" of the contract. Tr. 214:23-24 (Mills).

160.    AM General's McConville worked for the Department of the Navy, including as a contract officer, for more than 25 years before joining AM General. Tr. 256:23-258:14 (McConville). When McConville worked for NavAir, she used not-to-exceed pricing from time to time. Tr. 264:5-10 (McConville). Based on her experience, she did not use the same wording every time, but rather "would identify the price that is determined to be or identified as a not-to-exceed price and then put language within the contract that indicated that we would not pay more than that price when the final price is determined." Tr. 264:17-22 (McConville).

161.    Likewise, the only witness qualified as an expert in the case, Bingham, credibly testified that based on his 28 years in advising clients on government contract issues (Tr. 523:6-8 (Bingham)), government contractors can have not-to-exceed pricing without using the exact words "not to exceed" or the exact notation "NTE." Tr. 528:13-21 (Bingham). Bingham has seen contracts with not-to-exceed pricing that did not say "NTE" or "not-to-exceed." Tr. 528:22-25 (Bingham). For this case, he evaluated the February 2010 Change Blanket Contracts and determined that they have all of the characteristics of not-to-exceed pricing. Tr. 529:18-22,

530:17-531:7 (Bingham).  Demmer offered no contrary expert testimony on this issue and the Court finds Bingham's testimony on this point to be credible, well-founded, and reliable.

162.    In the field of government contracting, "re-negotiate" means "to adjust a defense contract price in order to eliminate or recover excessive profits" *Websters Third New International Dictionary* 1922; see also *Black's Law Dictionary* 1410 (9th ed. 2009)(defining "renegotiation" to include "[t]he reexamination and adjustment of a government contract to eliminate or recover excess profits by the contractor").

## V.    Findings Related to the Reasonable Prices at the Time for Delivery

### 1.    Reasonable Prices at the Time for Delivery

163.    AM General's damages equal the difference between the price AM General actually paid and the "reasonable price at the time for delivery" for Bi-Metal Doors shipped in 2010.  Ind. Code § 26-1-2-305(1).

164.    After accounting for returns, in 2010 Demmer shipped 25,321 front Bi-Metal Doors and 14,043 rear Bi-Metal Doors to AM General.  Stip. ¶ 32.

165.    Demmer's shipments of Bi-Metal Doors took place throughout 2010.  Tr. 133:4-10 (Peterson).

166.    Utilizing a reliable methodology which takes into account the unique facts of this case, Bingham concluded that the reasonable price for Bi-Metal Doors Demmer shipped to AM General in 2010 is the actual, allowable, and supported costs Demmer incurred in producing those doors plus a profit of 12.25%.  Tr. 536:11-17, 539:13-14 (Bingham).  Using this formula, Bingham concluded that the reasonable price for each front Bi-Metal Door shipped in 2010 is $2,264.73 and the reasonable price for each rear Bi-Metal Door shipped in 2010 is $2,320.21.  Tr. 542:20-23 (Bingham).  The Court accepts Bingham's methodology and conclusion.

### a.      **Demmer's Actual, Allowable, and Supported Costs**

167.     The actual, allowable, and supported cost to produce each door in 2010 was $2,017.58 for each front Bi-Metal Door and $2,067.00 for each rear Bi-Metal Door.  Tr. 537:16-25 (Bingham).

167.1    These actual, allowable and supported 2010 costs are based on Demmer's proposal and the certified data showing Demmer's 2010 actual costs in support thereof, as well as the May 27, 2011 DCAA audit report which considered those costs and which questioned some of those costs as unallowable and unsupported.  Tr. 536:18-537:2 (Bingham); PTX-146 (Demmer's submission of certified cost or pricing data to AM General in February 2011).

167.2    Kiraly criticized Bingham for relying on the DCAA audit report to determine the 2010 costs when that report was focused on Demmer's 2011 proposed costs.  Kiraly's concerns are misplaced and the Court disregards them.

167.3    Bingham relied on Demmer's own certified data for 2010 incurred costs (which it provided in support of its 2011 proposal).  Tr. 536:18-537:2 (Bingham); PTX-146.  Bingham relied on the DCAA audit report in determining which of Demmer's 2010 incurred costs were allowable and supported, and thus should be included in the basis of the 2010 reasonable price.  Tr. 536:18-537:2 (Bingham).  Kiraly overlooked the fact that Bingham used Demmer's certified 2010 incurred cost data (PTX-146), which Kiraly himself did not believe he had ever reviewed.  Tr. 787:9-16 (Kiraly).

167.4    Bingham's partial reliance on the DCAA audit report is further supported by the fact that the 2010 price for Bi-Metal Doors ultimately agreed upon by AM General and TACOM were based on the allowable and supported costs identified in the report.  Tr. 539:15-540:3 (Bingham); PTX-203 (Daniels Dep.) 233:1-235:3, 247:12-17; DTX-CN-001.  Given the context that AM General is the prime contractor, and the fact that TACOM had the DCAA audit report in hand when negotiating the 2010 prices, one cannot reasonably ignore the DCAA Audit Report.  *See* Tr. 575:24-576:4 (Bingham).

167.5    Demmer's actual costs for producing the Bi-Metal Doors shipped in 2010 were $2,058.10 per front Bi-Metal Door and $2,107.22 per rear Bi-Metal Door.  PTX-146.  PTX-146 contains the detailed data Demmer submitted to AM General on February 16, 2011 in support of the "cost or price data as submitted" on January 7, 2011 by Demmer for the "4 bi-metal part

numbers." PTX-146-001; PTX-140-004. The actual costs contained in Demmer's certified cost or pricing data for 2010 incurred costs are confirmed by documents in evidence. *See* PTX-023-001; PTX-025-002, -005; PTX-087-009–011 (breakdown of sub-component costs of each door); PTX-139-001 (Mars 300 and aluminum costs); PTX-155-001 (DCMA-Demmer exchange about "actual for 2010" labor hours and material costs); PTX-157-001 (providing DCAA information on Demmer's actual material costs for 2010); PTX-160.

167.6 PTX-146 contains a cost build-up for front Bi-Metal Doors of $2,058.10. PTX-146-114. The components of this cost build-up are based on Demmer's incurred costs for 2010. *See, e.g.*, PTX-146-131 ("The labor rates are the actual labor hours and labor costs for 2010 Jan-Nov", "The labor hours are the actual labor hours posted to the program in 2010 Jan-Nov"); PTX-146-135 ("Burden build up is based on 2010 financials through November plus 1 month projection of December."); PTX-146-158 ("Material Handling Buildup is based on the inventory shrinkage average through November 2010."); PTX-146-162 ("SG&A build up is based on 2010 financials through November plus 1 month projection of December.").

167.7 PTX-146 contains a cost build-up for rear Bi-Metal Doors of $2,107.22. PTX-146-057. The components of this cost build-up are based on Demmer's incurred costs for 2010. *See, e.g.*, PTX-146-074 ("The labor rates are the actual labor hours and labor costs for 2010 Jan-Nov", "The labor hours are the actual labor hours posted to the program in 2010 Jan-Nov"); PTX-146-078 ("Burden build up is based on 2010 financials through November plus 1 month projection of December."); PTX-146-101 ("Material Handling Buildup is based on the inventory shrinkage average through November 2010."); PTX-146-105 ("SG&A build up is based on 2010 financials through November plus 1 month projection of December.").

167.8 PTX-140 contains a January 7, 2011 certificate of "Demmer Corporation Current Cost or Pricing Data" signed by Shawa-DeCook. PTX-140-004. In the certification, Shawa-DeCook certified, on behalf of Demmer, that "the cost or pricing data (as defined in section 2.101 of the Federal Acquisition Regulation (FAR) . . . submitted, either actually or by specific identification in writing, to the Contracting Officer . . . in support of 2011 Aluminum Program Pricing . . . are accurate, complete and current as of January 7, 2011. . . . This certification includes the cost or pricing data . . . ." *Id.* The certification clarifies "Current cost or pricing data supplied is complete through November 2010 month end." *Id.*

167.9 Record evidence confirms the reliability of the 2010 incurred costs to which Demmer certified in PTX-140 and PTX-146. *See* PTX-23-001

(Mars 300 cost); PTX-025-002 (same); PTX-040-004 (glass cost); PTX-087-009–011 (itemized cost breakdown of Bi-Metal Door sub-components); PTX-121, PTX-138, PTX-139, PTX-157 (material); PTX-122 (material, SG&A, burden); PTX-155 (labor hours); PTX-160 (2010 costs in general).

168.    Demmer's actual, allowable, and supported costs for producing Bi-Metal Doors in 2010 can be determined by taking Demmer's actual costs incurred in 2010 and subtracting the costs questioned by the DCAA. Tr. 536:23-537:2 (Bingham).

169.    The May 27, 2011 DCAA audit report provides the DCAA's analysis of Demmer's proposal for 2011 Bi-Metal Doors. PTX-006-004. The proposed prices and costs audited by the DCAA match those in Demmer's certified cost or pricing data, which included Demmer's actual incurred costs of producing Bi-Metal Doors in 2010.[7] The DCAA audit report explains throughout that the prices in the subject proposal are based on Demmer's 2010 incurred costs. *E.g.*, PTX-006-008 ("The proposed direct labor rates are based on the actual rates for the individuals who worked on the prior HUMVEE door subcontract from January 1, 2010 through November 2010."). The DCAA audit report also contains and relies on a Defense Contract Management Agency ("DCMA") technical assist audit report which also examined Demmer's 2010 actual cost data for labor and material costs. PTX-006-026.

170.    The DCAA questioned a total of $247,516 of the proposed cost for the front doors, which translates to $40.52 per front door. PTX-006-008, PTX-006-017. The DCAA also questioned a total of $25,215 of the proposed cost for the rear doors, which translates to $40.21 per rear door. PTX 006-018, PTX 006-019. The DCAA questioned these costs because of

---

[7] The proposal being audited was for 6,108 of each of the two front doors and for 627 of each of the two rear doors. DTX-006-004. Dividing the total proposed costs for the front and rear doors by the quantity in the proposal yields a proposed price of $2,325.66 per front door and $2,381.16 per rear door, which match the prices in Demmer's certified cost or pricing data. PTX-006-007 (showing total costs per part number in DCAA audit report); PTX-146-122 (showing a price of $2,325.66 for the front doors); PTX-146-065 (showing a price of $2,381.16 for the rear doors).

calculation errors and double counting costs, PTX-006-013, lack of support for scrap rates PTX-006-014, inconsistent calculations for direct and overhead costs, PTX-006-015, and the inclusion of unallowable bad debts in the G & A rate, PTX-006-016.   Demmer did not challenge any of the DCAA's findings, either at the time of the audit or at trial.  *See, e.g.*, PTX-006-016 (after each category of questioned costs, the DCAA audit report contains the following language: "Subcontractor's Reaction.  [Demmer] withheld comments pending negotiation but stated that they have already negotiated with [AM General] based on actual cost or pricing data at the time of their negotiation."); Tr. 574:9-575:5 (Bingham).

### b. 12.25 Percent Is a Reasonable Profit Rate.

171.   The Court specifically finds that a 12.25 percent profit rate is reasonable under the circumstances.

> 171.1  A 12.25 percent profit  is higher than the profit rate Demmer ordinarily received on its contracts with defense contractors.  Tr. 686:2-25 (Shawa-DeCook) (12 percent is Demmer's standard, default profit rate for defense quotes and Demmer's typical profit for defense quotes); PTX-194 (McDonald Dep.) 64:8-16 (12 percent profit rate is Demmer's default); PTX-195 (Roberts Dep.) 21:17-21 (same); DTX-N-001 (Shawa-DeCook explaining that a 12 percent profit was "typical – high end of what's considered 'fair and reasonable.'"); Tr. 688:14-16 (Shawa-DeCook) ("Q. So a twelve percent profit rate is the high end of what's considered fair and reasonable, correct? A. Yes, twelve percent is typical, high end."); PTX-197 (Sjoberg Dep.) 156:22-157:3 (12 percent margin is generally "what we believed that the government contract would allow"); DTX-DD (Angell Dep.) 131:5-17 (12 percent profit rate is Demmer's default).

> 171.2  In its December 2009 proposal, Demmer sought a 14 percent profit rate based on the expectation of "drastically reduced volume." DTX-N-001.  In 2010, when the Bi-Metal Doors were delivered, that risk did not materialize; Demmer's justification for a higher-than-typical profit rate of 14% is not justified.

> 171.3  AM General and the Government agreed on a 12.25 percent profit for Demmer in agreeing to the 2010 prices of Bi-Metal Doors.  DTX-CM-003 (TACOM's Ruzicka explains in a handwritten note that "12.25% on Demmer Doors is consistent with what we gave in production K

[contract].").  TACOM is AM General's customer; TACOM's position on the fair and reasonable profit is an important consideration.

171.4  Bingham also credibly testified that based on his experience, which includes having advised on reasonable profit rates for government procurement contracts, and the facts of this case, that 12.25 percent profit is reasonable.  Tr. 539:13-540:3 (Bingham).  The Court specifically concludes that Bingham's testimony on this point is the sole convincing evidence as to profit margin.

172.  Kiraly opined that AM General and TACOM were both incentivized to set a low

price for the 2010 Bi-Metal Doors because the refund would ultimately be paid by Demmer.  Tr.

776:16-21 (Kiraly).  This view is contradicted by the record evidence and the Court rejects it.

172.1  TACOM had already paid AM General for the 2010 Bi-Metal Doors at the higher price for the predecessor door.  PTX-203 (Daniels Dep.) 231:19-25.  As a result, the lower the price to which AM General agreed for the 2010 Bi-Metal Doors, the larger the refund AM General would have to pay to TACOM.  *See* PTX-203 (Daniels Dep.) 232:2-9; Tr. 549:25-550:14 (Bingham).

172.2  Additionally, AM General attempted to negotiate with TACOM a higher price for the 2010 Bi-Metal Doors, but TACOM rejected the offers.  Tr. 568:21-569: 18 (Bingham); PTX-200 (offering to resolve the VECP using the NTE prices minus the $20 million offer that Demmer had proposed); PTX-201 (rejecting that offer). Kiraly was not aware that AM General sought higher prices for the Bi-Metal Doors or that TACOM rejected such offers.  Tr. 794:18-21, 794:25-796:19; 798:14-16 (Kiraly).

172.3  One of the exchanges with TACOM references taking "AMG's cost number for [D]emmer" and adding "our 12.25% profit rate on it."  DTX-CM-001.  AM General's "cost number" was not the NTE pricing, which TACOM had rejected.  *See* PTX-200 & PTX-201.  Rather, TACOM agreed to take the approved costs for Demmer "based on the audit" and add 12.25 percent to those costs.  PTX-203 (Daniels) Tr. 236:1-21; *see also id.* at 247:12-248:20 (discussing this exchange further, the DCAA's audit, and the fact that "the Government can use an audit for whatever they want, once they have it").  Daniels, who worked as a contract specialist at TACOM for seven years and has worked in AM General's Contracts Department for twenty-five years, reasonably understood that the DCAA audit would control TACOM's bargaining position.  *See* PTX-203 (Daniels) Tr. 8:17-9:13, 253:3-8.

### c. Demmer's Equitable Arguments Do Not Change the Reasonable Prices at the Time for Delivery.

173.    Demmer raises a number of equitable arguments to justify finding a higher "reasonable price at the time for delivery" for the 2010 Bi-Metal Doors.  Even if these arguments could alter the analysis, they are of no import here because Demmer has not proven the facts related to its equity arguments.

174.    Demmer claimed to have invested $15 million towards producing Bi-Metal Doors from 2006 forward.  Tr. 621:17-21 (Shawa-DeCook).  That figure covers several years.  Demmer did not introduce any evidence of any particular amount that it spent related to 2010 production. Demmer's CFO testified, however, that Demmer made "significant investment in 2007," well before the time at issue in this case.   Tr. 623:12-17 (Shawa-DeCook); *see also* PTX-193 (Heppler Dep.) 194:21-25, 208:6-17, 209:5-13, 209:19-210:17, 219:12-220:8, 231:20-232:17 (testifying that Demmer's various process improvements were put in place before 2010). Additionally, Demmer's headcount dropped from 2008 forward.  Tr. 625:6-18 (Shawa-DeCook). The drop in headcount coincided with consistently high production volumes from 2007, 2008, and 2009.  Tr. 812:9-14 (Tenlen).   The drop in headcount, despite high production volume numbers, is attributable to Demmer achieving additional efficiencies in its production capabilities.

175.    Demmer argues that it bore substantial performance risk during 2010 and should be rewarded for that.  But the Bi-Metal Doors were part of AM General's aluminum program. Tr. 200:25-201:4 (Mills); Tr. 384:16-22 (Lentych); Tr. 806:1-18 (Tenlen).  For the aluminum program, AM General took on most of the material risk, including the risk of instability in the supply of the material and the cost.  Tr. 384:23-385:5 (Lentych).  Demmer had a lower risk on the Bi-Metal Doors in 2010 because those doors were part of the aluminum program.

176.    Demmer also claims that the lower projected volumes in the June 2009 RFQ led to another significant risk that Demmer had to bear (and for which it should be rewarded).  The weight of the persuasive evidence does not support this argument.

176.1  Demmer's CFO testified that Demmer did not have any knowledge in advance that the 2010 volumes would not, in fact, be considerably lower than 2009.  Tr. 662:18-20 (Shawa-DeCook).  This view is contradicted by the persuasive evidence.

176.2  AM General's material group regularly informed Demmer of the expected quantities of doors.  Tr. 412:12-415:14 (Lentych); PTX-86; PTX-34.  Demmer learned actual volumes from "releases" issued by AM General's materials management or scheduling group.  Tr. 662:21-23 (Shawa-DeCook); Tr. 927:13-928:1 (Tenlen). On July 9, 2009—before Demmer had even completed its response to the June 2009 RFQ—Tenlen expected 2010 door volumes to be 40,000.  PTX-011-001; Tr. 912:5-20 (Tenlen).  In August 2009, AM General reiterated that the 2010 "schedule hasn't changed."  PTX-023-001.

176.3  On October 13, 2009, AM General advised Demmer to plan on producing 12,168 doors in the first quarter of 2010.  PTX-034-003; Tr. 414:3-16 (Lentych).   Tenlen promptly alerted Demmer's suppliers of that requirement.  PTX-035-001.

176.4  Similarly, on January 5, 2010, Demmer expected to make approximately 8,000 to 10,000 Bi-Metal Doors per quarter, and informed its suppliers accordingly.  PTX-057-001; Tr. 913:16-19 (Tenlen).

176.5  On January 20, 2010, AM General sent Demmer a schedule release that anticipated building 11,538 HMMWVs, each of which have two or four doors.  Tr. 415:17-417:10 (Lentych); PTX-062-004.   Tenlen shared a similar, high volume forecast with Shawa-DeCook and others at Demmer in early February 2010.  PTX-072-001, -004.

176.6  As of late March 2010, Tenlen, Heppler, and Dargitz all expected Demmer to make 38,000 doors for the year.  PTX-085-001; Tr. 914:5-20 (Tenlen); *see also* PTX-086-003 (anticipating 18,948 Bi-Metal Doors required for six months of 2010).

176.7  Thus, whether the Court evaluates the risk of diminished volumes *ex ante* or *ex post*, Demmer never shouldered that risk for 2010.  Moreover, there is no record evidence that Demmer spent one dollar more than it would have on 2010 Bi-Metal Door production based on the lower projected volumes in the June 2009 RFQ.  As Shawa-DeCook explained internally in

December 2010 about supplier costs in connection with the "AMG Price Audit," "Since 2010 volumes remained/did not decrease as expected—we may have not been impacted [by increased supplier costs]—yet." PTX-121-001.

> ### d. Jackson's Hypothetical Negotiation Is Not Based on a Reliable Methodology.

177. Demmer argues that the reasonable prices at the time for delivery should be the NTE prices. Demmer attempts to justify this position through its retained witness, Jackson, whom Demmer did not attempt to qualify as an expert. The Court rejects this analysis as unreliable, unpersuasive, and inconsistent with the record evidence.

178. First, Jackson postulated a "hypothetical negotiation" between the parties as of December 2009 or January 2010—before the time for delivery (or, at most, at the very beginning of that time). *See, e.g.*, Tr. 133:4-10 (Peterson) (Demmer delivered doors throughout 2010). Jackson therefore did not answer the question that UCC § 305 requires the Court to answer—the "reasonable price at the time for delivery" for 2010 shipments of Bi-Metal Doors. Ind. Code § 26-1-2-305(1).

179. Second, Jackson's hypothetical negotiation relies on a legal regime (the *Georgia-Pacific* factors) that is not suited for this type of case. There is no patent, trademark, or other intellectual property "reasonable royalty" to be determined in this case. (Indeed, the only other case identified by Jackson in which he apparently used the *Georgia-Pacific* factors involved the alleged misappropriation of intellectual property. Tr. 1003:24-1004:3 (Jackson).) Moreover, the methodology employed does not take into account the role of TACOM in the negotiation process and the requirement that prices flowing up from the subcontractor, to the prime contractor and ultimately to the Government must be fair and reasonable.

180.    Third, Jackson's hypothetical negotiation fails to consider what AM General would have done with the information it specifically requested but Demmer refused to provide. Apparently to avoid this issue, the question—as posed by Jackson—is to what price the parties might have agreed no later than February 3, 2010.  Tr. 1043:3-7 (Jackson).

    180.1    That date, not coincidentally, falls just before the parties had a meeting at which AM General requested substantial, additional labor hours data from Demmer.  *See* Stip. ¶ 25.  Mr. Jackson's analysis thus assumes that AM General did not have, and would not get, the 12 months of actual 2009 labor hours data that were requested at the February 4, 2010 meeting. Jackson testified that "the February 4th meeting could just as easily have occurred in January of 2010," Tr. 1007:4-12, but his analysis nevertheless failed to consider the information that AM General requested at that meeting but that Demmer refused to provide.  This approach contradicts the *Georgia Pacific* requirement, which assumes "that the parties were privy to all pertinent information."  *TP Orthodontics, Inc. v. Prof'l Positioners, Inc.*, No. 72-C-697, 1991 WL 187189, at *11 (E.D. Wis. July 2, 1991) (citing *Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116, 1121 (S.D.N.Y. 1970)). Jackson also did not identify the specific *Georgia-Pacific* factors, if any, that he applied.

    180.2    As Bingham, whose methodology and conclusions the Court finds not only convincing but applicable to this case,  credibly pointed out, if AM General had learned about Demmer's combining of Frag 5 and Bi-Metal Door labor hour data and disagreed with it, that one new fact would have led to the parties being more than $500 apart, per door—a significant delta.  Tr. 560:9-561:6 (Bingham).  Given the disparity in the information in Demmer's December 2009 price proposal and the actual data for items such as labor hours, it would be too speculative to imagine how AM General might have reacted to it.  *See* Tr. 562:10-563:4 (Bingham).

181.    Fourth, Jackson's analysis assumes—erroneously—that the parties had to reach agreement on price and could not, for example, use NTE pricing until they completed the audit and negotiated final prices.  *See* Tr. 563:9-18 (Bingham).

    181.1    *Georgia Pacific* typically is used when the factfinder must establish a final price at the time of infringement of the intellectual property.  *See, e.g.*, *Innogenetics, N.V. v. Abbott Labs.*, 578 F. Supp. 2d 1079, 1094 (W.D. Wisc. 2007) ("Unlike a real negotiation, this hypothetical negotiation assumes that the infringer must agree to some amount of royalty payment; it does not have the option of walking away from the

table."), *aff'd in part and rev'd in part on other grounds*, 512 F.3d 1363 (Fed. Cir. 2008).

181.2   In this case, there was no requirement that the parties finalize prices in December 2009 or January or February 2010. (Indeed, Demmer has emphasized that the 2009 price could have been carried over.) Accordingly, there is no need to engage in a hypothetical negotiation or impose an artificial deadline like February 3, 2010.

182.    Fifth, Jackson's analysis rejected every concern that AM General had raised, assumes that AM General would have acquiesced to Demmer's position, and conveniently (for Demmer) arrives at the NTE price as the price the parties would have agreed upon.

182.1   Jackson took as AM General's opening negotiation position the issues raised in Lentych's January 25, 2010 email, PTX-65. *See* Tr. 1008:11-17 (Jackson). But Lentych credibly testified that PTX-65 did not state AM General's negotiation position at that time. Tr. 394:17-24 (Lentych). Lentych further credibly testified that AM General had not developed a negotiating position on the 2010 Bi-Metal door prices when he sent PTX-65 on January 25, 2010. Tr. 395:19-21 (Lentych). There likewise is no document in evidence that suggests AM General had such a position at that point in time. Jackson acknowledged Lentych's trial testimony, but nevertheless adhered to his position that PTX-65 is the appropriate starting point for AM General's negotiation position. Tr. 1008:18-1009:2 (Jackson).

182.2   Jackson dismissed Lentych's statements in PTX-65 about Demmer's overhead rate as a "red herring." Tr. 1010:7-1011:15 (Jackson). Jackson claimed, "No AMG witness was able to cite any document or any objective foundation for this so-called industry average or standard" overhead rate. Tr. 1010:24-1011:3 (Jackson). Based on this analysis, Jackson inferred that AM General therefore would have capitulated on the issue of overhead cost and agreed to the amounts included in Demmer's December 2009 price proposal. Tr. 1020:3-6 (Jackson). But both trial testimony and record evidence indicated that the overhead rates of other armor suppliers were lower. Tr. 446:17-21 (Lentych); PTX-187. Lentych had substantial experience with this issue at the time he sent PTX-65.

182.3   Jackson likewise claimed that "there is no objective evidence supporting AMG's position that [the profit rate] should have been 10 percent" and "no objective evidence supporting AMG's position that that [10 percent] was some sort of industry standard or industry average." Tr. 1019:6-12 (Jackson). Jackson therefore determined that AM General would have capitulated to Demmer's request for a 14 percent profit rate. Tr. 1019:13-

17, 1020:3-6 (Jackson). But again, Jackson's view of the record was mistaken: AM General's contemporaneous business records objectively showed that the typical profit rate for other armor suppliers responding to the June 2009 RFQ was approximately 8 percent. Tr. 399:18-22 (Lentych); PTX-187. Moreover, in adopting Demmer's proposed profit rate of 14 percent, Jackson overlooked the fact that Demmer's own CFO at the time, Heather Shawa-DeCook, testified that a 12 percent profit rate was "typical, high end." Tr. 688:14-16 (Shawa-DeCook); *see also supra* ¶171.

## 2. Quantities of Bi-Metal Doors Shipped in 2010

183. After accounting for returns, in 2010, Demmer shipped 25,321 front Bi-Metal Doors and 14,043 rear Bi-Metal Doors to AM General. Stip. ¶ 32.

## 3. Calculation of AM General's Overpayment

184. AM General's damages equal the amount it overpaid for Bi-Metal Doors in 2010. The amount AM General overpaid for each Bi-Metal Door shipped in 2010 is the difference between the NTE price that AM General actually paid and the reasonable price at the time for delivery.[8] Multiplying the overpayment per door by the quantities of Bi-Metal Doors shipped in 2010, AM General's total overpayment to Demmer was $47,333,309. Tr. 543:22-544:5 (Bingham). After subtracting the $19,366,811 AM General withheld from Demmer in December 2010 and January 2011, PTX-177, DTX-CR, AM General is still owed $27,966,498. Tr. 564:4-22 (Bingham).

By contrast, if Demmer were permitted to keep the payments that AM General made to Demmer based on the NTE prices, Demmer's profit rate would be approximately 71 percent. Tr. 544:15-22 (Bingham). This figure far exceeds the 14 percent Demmer claimed to be seeking in

---

[8] Although AM General did not pay a consistent price for each front Bi-Metal Door or a consistent price for each rear Bi-Metal Door shipped in 2010 (because of a small price adjustment for a change in insulation in the door), the parties "trued-up" the effective price AM General paid in 2011. PTX-150; PTX-151; PTX-152; PTX-153; PTX-154. As a result of a series of credit memos Demmer issued in March 2011, AM General effectively paid $3,470.00 for each front Bi-Metal Door shipped in 2010 and $3,517.58 for each rear Bi-Metal Door shipped in 2010. Tr. 424:24-425:6 (Lentych).

its 2009 proposal. This figure also far exceeds the 12 percent profit rate that Demmer's CFO described as "typical, high end." Tr. 688:14-16 (Shawa-DeCook); *see also supra ¶171*. It also would be many times the 15 to 16 percent maximum profit Demmer has ever achieved on any contract. DTX-DD (Angell Dep.) 132:16-20.

### 4. AM General's Out-of-Pocket Loss Totals $27,413,238

185.   Of the $47,333,309 AM General overpaid to Demmer, AM General was not reimbursed a total of $27,413,238. Tr. 547:3-19 (Bingham).

> 185.1   In 2010, AM General and TACOM had an outstanding engineering change proposal (ECP) for the Bi-Metal Doors. In 2007, AM General developed the Bi-Metal Doors as a "lighter weight door than the Standard Threat Door." PTX-202-001; Tr. 955:5-11 (Castelluccio). The Bi-Metal Door turned out to be less expensive than the predecessor door. From 2007 until early 2011, AM General's contract price with TACOM was based on the more expensive predecessor door. As a result, AM General and TACOM had to determine the refund to which TACOM was entitled as a result of the Bi-Metal Door.

> 185.2   After several attempts over a period of months, AM General convinced TACOM to accept the Bi-Metal Door change proposal as a VECP. Tr. 953:21-954:15 (Castelluccio); PTX-203 (Daniels Dep.) 209:3-9, 210:19-25. Under a VECP, the contractor (AM General) and the government share the cost savings whereas under an ECP, the government receives all of the cost savings. PTX-203 (Daniels Dep.) 206:4-13. The contractor is entitled to share in the cost savings in a VECP because the contractor has, at its sole expense, initiated and developed an engineering change that reduces the cost of the end-product. PTX-203 (Daniels Dep.) 207:16-208:4. AM General historically was not very successful in persuading TACOM to treat engineering changes as VECPs. Tr. 952:23-953:2 (Castelluccio). To get TACOM to treat the Bi-Metal Door engineering change proposal as a VECP, AM General had to forfeit its right to challenge TACOM's unilateral price determination on the 2011-2013 production contract. PTX-203 (Daniels Dep.) 211:1-9. AM General valued that claim at about $50 million. PTX-203 (Daniels Dep.) 222:21-223:8.

> 185.3   As a result of the Bi-Metal Door change proposal being a VECP, AM General did not have to refund to TACOM the entire difference between the fair and reasonable price and the NTE price. AM General did, however, have to refund TACOM $57,398,031 for Bi-Metal Doors delivered in 2010 alone. Tr. 548:4-10, 17-24, 549:13-16 (Bingham).

185.4 Once TACOM accepted the VECP, AM General and TACOM incorporated the VECP into AM General's prime contract. *See generally* PTX-173, PTX-179, PTX-180. AM General then had to certify as current, accurate, and complete its cost or pricing data associated with the VECP. PTX-175-001–002.

## W.    Demmer's Counterclaim Related to 2010 Pricing.

186.    Demmer seeks a refund of the amounts that AM General withheld for overpayments on the 2010 price dispute. For the reasons stated above, Demmer failed to introduce persuasive evidence that AM General breached the parties' contract when it withheld funds based on 2010 overpayments.

187.    Additionally, Demmer failed to prove causation or damages for this claim. Demmer claims that a Demmer accounting report, DTX-CQ, shows that, "For 2010 and 2011 deliveries of bi-metal doors, AMG wrongfully withheld a total of $19,861,345.15." Demmer T.B. at 24. Demmer's only proffered evidence of the damages for its counterclaim for amounts AM General withheld for 2010 prices is DTX-CQ. But this document is not reliable evidence to prove any damage to Demmer caused by AM General concerning 2010 Bi-Metal Door prices because: (1) it does not segregate the amounts withheld by AM General relating to the 2010 pricing dispute from amounts not paid because of the 2011 pricing dispute; (2) it includes invoices for all parts AM General purchased from Demmer and is thus not limited to Bi-Metal Doors; and (3) the report includes entries that are unrelated to AM General's withholding.

187.1 DTX-CQ does not segregate Demmer's claim for 2010 from its claim for 2011 underpayments. *See* DTX-CQ-021 (providing a single total for all entries in 2010-2011).

187.2 DTX-CQ is not limited to unpaid invoices for Bi-Metal Doors, but includes other parts, such as cross members. Tr. 710:2-9 (Shawa-DeCook). The report provides no way to determine which invoices relate to Bi-Metal Doors.

187.3 DTX-CQ is a report that includes all "unpaid amounts from AM General between 2010 and 2011." Tr. 680:23-25 (Shawa-DeCook). The only sponsor of the document, Shawa-DeCook, did not know, for any entry in DTX-CQ, the reason AM General did not pay the invoice. Tr. 708:22-709:22 (Shawa-DeCook). Thus, the report is not limited to amounts AM General withheld over either the 2010 or the 2011 pricing dispute, but also includes balances on invoices AM General refused to pay for other reasons, such as quality or quantity problems. Tr. 709:12-15, 711:11-15 (Shawa-DeCook). This is not a hypothetical concern—AM General raised quality issues about separate parts (cross-members) that Demmer was supplying during this same time period, and the parties discussed a "debit" or "charge-back" to AM General over the issue. Tr. 710:5-711:10 (Shawa-DeCook). The report provides no way to determine the reason why AM General did not pay any given entry listed in DTX-CQ.

188. The only record evidence of the amount AM General withheld in December 2010 to January 2011 related to the 2010 pricing dispute is PTX-177, which calculates the withholding to be $19,366,810.09. PTX-177-010; *see also* DTX-CR (11/13/13 Declaration from AM General's Manager of Accounts Payable explaining PTX-177). This figure is corroborated by AM General's September 9, 2011 final decision letter to Demmer. PTX-174-004.

## X.  **Demmer's Counterclaim Related to 2011 Pricing**.

189.  Demmer did not introduce persuasive evidence that AM General breached the parties' contract when it reduced the prices that it paid to Demmer for Bi-Metal Doors in the second half of 2011.  *See* PTX-166-002.  Demmer fully expected that AM General would not agree to pay Demmer's costs if DCAA questioned or otherwise objected to them.  *See* PTX-148-001 (3/7/11 Shawa-DeCook internal email, "We have a meeting with DCAA/TACOM/AMG tomorrow and I need to make sure I know the concerns on rates.  AMG may not agree with them until after DCAA has audited."); PTX-149-001 (3/9/11 internal Demmer email to Tenlen identifying various Bi-Metal Door part numbers:  "So are they finally coming back and asking us for a change in their price?"  Tenlen:  "☹ Si Senorita. . . "); PTX-158-001 (5/20/11 Tenlen email, "It is apparent that AMG is in [sic] the belief that the outcome of our DCAA audit is going to have some influence on the pricing of the parts that we are looking for increases on."); PTX-167-001 (7/5/11 Tenlen email to Koch re: "Price Change on Doors" asking for help "to make adjustments to bring the pricing to the new 'lower' prices based on the DCAA adjustments"); PTX-169-001 (8/2/11 handwritten notes of Demmer's COO referencing "2011 Pricing Change (Post-Audit)").

190.  Additionally, Demmer failed to prove causation or damages for its 2011 pricing counterclaim.  Demmer claims that AM General underpaid Demmer for Bi-Metal Doors shipped in the second half of 2011.  Counterclaim ¶ 63.  Demmer has offered no evidence from which to calculate this alleged underpayment.

191.  Demmer again relies on DTX-CQ as proof of its damages for its 2011 Counterclaim.  In addition to the flaws with this document shown above, DTX-CQ does not provide a basis for Demmer's claimed damages for the alleged 2011 underpayment.

192.    DTX-CQ does not document *a single* unpaid amount for goods shipped after March 28, 2011.  DTX-CQ-020 (containing 11 entries for goods shipped on March 28, 2011); Tr. 708:10-19 (Shawa-DeCook) (confirming that the "DOC date" column reflects the date on which the parts were shipped and the invoice was issued).    DTX-CQ thus provides no information about the magnitude of AM General's alleged underpayment in the latter half of 2011.  *See* PTX-166-002 (6/30/11 correspondence form AM General reducing the 2011 prices "effective for shipments subsequent to 07/01/11").  Nor could DTX-CQ reflect any damage to Demmer caused by AM General's alleged underpayments, which did not begin until months later, in July 2011.

## CONCLUSIONS OF LAW[9]

I.    AM General Prevails on the Claim for Breach of the February 2010 Change Blanket Contracts.

Indiana law governs this contract dispute.  PTX-003-013, cl. 29 (A)(1).  "The essential elements of a breach of contract action are the existence of a contract, the defendant's breach thereof, and damages."  *Bachman v. AMCO Ins. Co.*, 897 F. Supp. 2d 780, 785 (N.D. Ind. 2012) (citing *Rice v. Hulsey*, 829 N.E.2d 87, 89 (Ind. Ct. App. 2005)).  The contract in this case governs the sale of goods and is governed by Indiana's Uniform Commercial Code ("UCC"), Ind. Code §§ 26-1-1-101, *et seq.*

The parties agree that:  (1) a contract between them existed for the sale of Bi-Metal Doors delivered in 2010, Stip. ¶¶ 6, 9; (2) the relevant contract language governing the dispute is contained in the Note (PTX-4) and AM General's Terms & Conditions (PTX-3), Stip. ¶¶ 14-15, 26-27; (3) regardless of the final prices for Bi-Metal Doors to be shipped in 2010 (which the

---

[9] Any proposed conclusion of law included herein that is deemed to be a finding of fact is hereby incorporated into the findings of fact.

parties dispute), those prices are retroactive to January 1, 2010 of the year (PTX-78, PTX-150, PTX-153); and (4) Demmer accepted and performed under the contract, Stip. ¶¶ 28-29.

At the time Demmer received the February 2010 Change Blanket Contracts, Demmer's Program Manager responsible for the Bi-Metal Doors reviewed the contracts, including the Note. Tenlen reviewed and approved the contracts at the time. Tr. 911:4-10 (Tenlen); PTX-080-001. Demmer accepted the contracts and put them into the Demmer system. Tr. 911:11-14 (Tenlen).

The Court previously ruled that the Note in the February 2010 Change Blanket Contracts is ambiguous. *See* Op. & Order (D.E. 136) at 16. After reviewing the law, the contract language, and hearing the extrinsic evidence, the Court agrees with AM General that the plain language of the February 2010 Change Blanket Contracts reflects that the parties agreed that the 2009 prices would not carry over to 2010 deliveries, and to set open, not-to-exceed prices for 2010 that would be negotiated after AM General's audit of Demmer's price proposal. *See* FoF ¶¶ 69-92.

A. The Contract Language Supports AM General's Position.

The language of the Note supports AM General's position. The use of the mandatory phrases "will be re-negotiated" and "will not exceed" in the Note established open, not-to-exceed prices that the parties left to be settled in the future. Applying the grammar rules, use of the word "will" before a verb (such as "be re-negotiated") indicates a future commitment to do something—here, to re-negotiate. *See Webster's Third New International Dictionary* 2616 (2002) ("will . . . used to express simple futurity"). The phrase "will be re-negotiated" imposed a requirement to negotiate further in the future. *See id.* ("will . . . used to express a command, exhortation, or injunction").

The term "re-negotiated" in the Note also supports AM General's reading. Re-negotiate means not only "to negotiate anew" but also "to adjust a defense contract price in order to eliminate or recover excessive profits." *Webster's Third New International Dictionary* 1922 (3d ed. 2002) (emphasis added); *see also Black's Law Dictionary* 1410 (9th ed. 2009) (defining "renegotiation" to include "[t]he reexamination and adjustment of a government contract to eliminate or recover excess profits by the contractor"). Here, the Court is interpreting a defense subcontract for a non-commercial item to be sold to the government, for which excessive profits could not properly be earned or retained. Under these circumstances, the defense contract-oriented definition of "re-negotiate" governs.

As of February 2010, the parties had exchanged some correspondence and had a meeting about the potential prices, but had not agreed to settled prices. *See* FoF ¶¶54, 61-65. This factual context further justifies the use of the word "re-negotiated" rather than "negotiated." The parties had exchanged some information that could be characterized as negotiations; use of the word "re-negotiated" made clear that further negotiations were required after Demmer provided the appropriate data. *See* FoF ¶¶54, 69-70, 82. AM General had requested additional data from Demmer, but Demmer had not yet provided those data. *See* FoF ¶¶64-66. Demmer's accurate and complete data would have revealed excessive profits (either shown explicitly or masked as inflated costs). *See* FoF ¶¶30-33, 38-45. As a defense contractor, AM General is required to ensure that its prices, including prices quoted by AM General's subcontractors, are fair and reasonable and do not include excessive profits. FoF ¶21. Receiving and analyzing these data was, therefore, necessary before AM General could complete its audit of Demmer's price proposal and negotiate settled prices that did not include excessive profits. Demmer knew of this obligation at the time of contracting. FoF ¶21.

The second half of the first sentence of the Note establishes the intended time for the re-negotiation: "following completion of the Oct, 2009 AMG-Demmer Finance Audit results in cost breakdown changes." This, too, makes sense in context: the purpose of the audit was to evaluate Demmer's accurate and complete cost data and price proposal to determine fair and reasonable prices, and thus avoid overcharging the Government and awarding Demmer excessive profits. The particular items mentioned in this half of the sentence were well understood by the parties, then and now: Demmer stipulated that, "On October 19, 2009, AM General representatives Steve Hodge, Todd Lentych, and Dean Fiess travelled to Demmer to begin auditing Demmer's proposal for 2010 prices for Bi-Metal Doors." FoF ¶34 (Stip. ¶ 19). Demmer also stipulated, "After the October 19, 2009 meeting, Demmer re-submitted its 2010 Bi-Metal Door proposal with lower pricing reflecting cost breakdown changes that Demmer described at the October 19, 2009 meeting." FoF ¶37 (Stip. ¶ 21). AM General needed to complete the audit of the cost breakdown changes that Demmer supplied in October 2009 and make adjustments to eliminate excessive profits before the 2010 Bi-Metal Door prices could be settled.

Demmer has suggested that the word "if" should be added to the Note before the phrase "results in cost breakdown changes . . . ." PTX-078-001. Adding words to the contract is impermissible. *See Winterton, LLC v. Winterton Investors, LLC*, 900 N.E.2d 754, 759 (Ind. Ct. App. 2009) (prohibiting courts from "add[ing] provisions not agreed upon by the parties" to contracts when interpreting them). At the time AM General drafted the Note, Demmer had already provided cost breakdown changes, which were the subject of the audit. *See* FoF ¶¶35-36, 54-55, 69-70, 82. The entire second half of the relevant sentence ("completion of the Oct, 2009 AMG-Demmer Finance Audit results in cost breakdown changes," PTX-078-001)

establishes when ("following completion . . . " *id.*) the parties would conduct the requisite re-negotiation. *See* FoF ¶82.

The second sentence of the Note limits the scope of the re-negotiation. The word "However" indicates that the sentence will limit or otherwise qualify the scope of the re-negotiation set out in the first sentence. *See Webster's Third New International Dictionary*, *supra*, at 1097 (defining "however" to include "in spite of that: on the other hand: but"). That qualification is not ambiguous: "any price re-negotiated will not exceed the Dec, 2009 pricing set within this contract revision." PTX-078-001; *see also* Op. & Order (D.E. 136) at 15 ("This language supports AMG's contention that the price was a 'not to exceed' price with the final price being settled after the renegotiation that was to occur at the conclusion of the AMG-Demmer Finance Audit."). As drafted, the intended re-negotiation would result in prices that would not be greater than the placeholder price in the change blanket contracts—$3,482.34 for each front door and $3,513.53 for each rear door. In other words, the re-negotiation following the audit could not increase the prices.[10] *See* FoF ¶¶69, 79, 83-86.

### B.     The Extrinsic Evidence Supports AM General's Position.

The evidence of the parties' course of dealing and course of performance further support AM General's reading.[11] *See* FoF ¶¶85-92, 99, 104-107, 114-115, 117-118, 126, 143-155. Demmer concedes that not-to-exceed pricing is "an example of parties expressing a mutual,

---

[10] The Court previously rejected Demmer's invocation of *contra proferentem* as the way to resolve the dispute. *See* Op. & Order (D.E. 136) at 17 n.15; *see also Bradley v. W. & S. Fin. Grp.*, No. 2:05 CV 39, 2005 U.S. Dist. LEXIS 26003, at *20 (N.D. Ind. Oct. 20, 2005) ("[T]he application of *contra proferentem* is 'premature' in situations where 'there has not yet been any attempt to resolve the ambiguity through the 'ordinary interpretive guides'—namely, a consideration of the extrinsic evidence.'" (citation omitted)). Because the extrinsic evidence resolves any remaining doubts about the meaning of the Note, there is no basis to construe the Note against AM General.

[11] Because the Court has held that the Note is ambiguous, Op. & Order (D.E. 136) at 16, it may consider extrinsic evidence, including with respect to the parties' intent, when the Note was drafted, their course of dealing and course of performance, and trade usage. *Id.*

objective intent to have an open-price term contract" of the kind that "UCC Section 305 is talking about." Feb. 25, 2014 Hr'g Tr. 37:10-18. Therefore, if AM General proves that the parties agreed to not-to-exceed pricing in the February 2010 Change Blanket Contracts, then UCC § 305 applies. The greater weight of the persuasive evidence confirms that Demmer understood from the outset that the February 2010 Change Blanket Contracts established open, not-to-exceed pricing. Therefore, UCC § 305 applies.

Demmer's pre-litigation, internal documents repeatedly refer to the February 2010 Change Blanket Contracts as not to exceed. *See* FoF ¶¶85, 148. Trade usage also supports AM General's position. *See* FoF ¶¶156-161.

      C.    <u>Demmer's Alternative Reading of the Note, To Impose a Condition Precedent, Results in the Same Outcome.</u>

Demmer argues that the Court should read two conditions precedent into the Note: completion of the "Oct, 2009 AMG-Demmer Finance Audit" and generating "cost breakdown changes" from that audit. Demmer T.B. at 10. Demmer further contends that "re-negotiation was not triggered" because AM General either completed its audit and found no basis to change Demmer's cost breakdown, or "never bothered to complete its audit." *Id.* at 10-11. Even if the Court were to adopt this impermissible reading of the Note, however, Demmer would still lose because it frustrated the completion of such conditions precedent. *See* FoF ¶¶59-60, 65-68, 93-97, 100, 102-104, 108, 118, 140.

For more than 150 years, Indiana courts have recognized that, "The law is settled that where a precedent condition was to have been performed by the plaintiff, but its performance has been prevented by the defendant, such prevention may be averred as an excuse for the non-performance." *Ruble v. Massey*, 2 Ind. 636, 637-38 (1851) (per curiam); *accord Hawley v.*

*Smith*, 45 Ind. 183, 202 (1873).  That law applies to negotiation obligations such as the one imposed by the Note.

In *Niezer v. Todd Realty, Inc.*, for example, the court affirmed judgment in favor of a real estate company because the defendant, who had retained the real estate company to assist in selling property on his behalf, "thwart[ed] the negotiating process" after receiving two offers at or above his asking price.  913 N.E.2d 211, 214, 217 (Ind. Ct. App. 2009).  Because the defendant impeded the real estate company's ability to fulfill a condition precedent in the listing agreement—finding a satisfactory buyer for consummation of a final sale—the condition was excused and the real estate company was entitled to its commission.  *Id.* at 218; *accord Rogier v. Am. Testing & Eng'g Corp.*, 734 N.E.2d 606, 621 (Ind. Ct. App. 2000) (recognizing "the rule that a party may not rely on the failure of a condition precedent to excuse performance where that party's own action or inaction caused the failure").

Additionally, § 305 likewise gives AM General the authority to "fix a reasonable price" on its own if the price "fails to be fixed through fault of one (1) party."  Ind. Code § 26-1-2-305(3).  Under either the common law or the UCC, even if the Court were to adopt Demmer's reading of conditions precedent, into the Note, AM General would prevail.  This alternative holding is based on the Court's finding that Demmer frustrated and delayed AM General from completing the audit or the required re-negotiation established in the Note. FoF ¶¶59-60, 65-68, 93-97, 100, 102-104, 108, 118, 140.[12]

---

[12] The Wisconsin case on which Demmer relies imposed a "definite price subject to revision" and is inapposite.  The contract in that case "specifically provide[d] for the possibility that the parties may fail to reach an agreement."  *Dairyland Power Coop. v. Amax, Inc.*, 700 F. Supp. 979, 991 (W.D. Wis. 1986) (cited in Demmer T.B. at 4).  The court observed that "[u]nder normal circumstances, a contract that sets prices according to a detailed price adjustment mechanism tied to specific cost factors does not implicate the open price provisions of UCC § 2-305."  *Dairyland Power Coop.*, 700 F. Supp. at 990.  By contrast, the Note imposed a mandatory re-negotiation and did not contemplate the parties maintaining the open, ceiling price without negotiating; nor did the Note include a detailed price adjustment mechanism.  *See* PTX-078-001 ("2010 Pricing *will be re-negotiated*" and "any price re-negotiated *will not exceed*" (emphases added)).

D. The Reasonable Prices at the "Time for Delivery."

Under the UCC, parties can agree to open prices. The UCC provides that if the parties are unable to agree on a settled price after performance, the Court must establish "a reasonable price at the time for delivery." Ind. Code § 26-1-2-305(1); *see also Allen v. Clarian Health Partners, Inc.*, 980 N.E.2d 306, 309 (Ind. 2012) ("We agree that if a contract is uncertain as to a material term such as price then Indiana courts may impute a reasonable price.").

A little more than one year ago, Indiana Superior Court Judge Michael J. Scopelitis presided over a bench trial that addressed a separate dispute with another AM General supplier. In entering Findings of Fact and Conclusions of law, the Court used UCC § 305 to resolve open prices. In that case, BAE Systems, Inc. ("BAE") entered into contracts that provided, in relevant part, "These revised prices are subject to: A) Audit by AMG and/or TACOM" and "All prices are 'not to exceed' and 'subject to audit & negotiations.'" *AM Gen. LLC v. BAE Sys., Inc.*, No. 71D07-0907-PL00195, Findings of Fact & Conclusions of Law (St. Joseph Sup. Ct. Apr. 2, 2013) ("*AM General v. BAE*"), ¶ 13. After a government audit of BAE's data revealed inflated prices, BAE refused to lower its prices voluntarily. *Id.* ¶¶ 144-148. Ultimately, the parties could not agree on the terms of the new, reduced prices in the contract. *Id.* ¶ 151. In resolving the parties' dispute, in which BAE (like Demmer here) claimed that it had no requirement to negotiate, the court determined that the contract language "subject to audit" and "subject to audit and negotiation" "indicate[d] that BAE's armor prices were subject to further negotiation and not final[.]" *Id.* ¶ 208. Accordingly, relying on Ind. Code § 26-1-2-305(1), the Court set the reasonable prices at the time for delivery at "the price TACOM finally agreed to pay for BAE's parts." *Id.* ¶ 210. Those prices were based on BAE's actual costs incurred during the production year. *See id.* ¶¶ 160, 162.

Here, as memorialized in the Note, the parties intended to settle 2010 pricing following completion of AM General's audit. The parties did not do so, and the Court therefore must set "reasonable price[s] at the time for delivery."[13] Ind. Code § 26-1-2-305(1).

Demmer has suggested (through its sponsorship of Jackson's hypothetical negotiation, based in December 2009 or January 2010, FoF ¶¶177-182) that in establishing the reasonable price, the Court should look to the time of contracting, rather than "the time for delivery." Ind. Code § 26-1-2-305(1). Demmer is mistaken. "When interpreting the words of a single section of a statute, [courts] must construe them with due regard for all other sections of the act and with regard for the legislative intent to carry out the spirit and purpose of the act. We presume words appearing in the statute were intended to have meaning, and we endeavor to give those words their plain and ordinary meaning absent a clearly manifested purpose to do otherwise." *City of Muncie v. Lowe*, 705 N.E.2d 528, 531 (Ind. Ct. App. 1999) (citation omitted); *see also George v. NCAA*, 945 N.E.2d 150, 154-55 (Ind. 2011). In the Indiana UCC, the legislature uses the term "time of contracting" in several other places. *See* Ind. Code §§ 26-1-2-107(2), 26-1-2-308(b), 26-1-2-312(b), 26-1-2-315, 26-1-2-401(3)(b). The use of a different term with a different meaning in § 26-1-2-305(1)(b) confirms that "time for delivery" means what it says.

The Court determines that settling the prices in the February 2010 Change Blanket Contracts results in a price of $2,264.73 per front Bi-Metal Door and $2,320.21 per rear Bi-Metal Door. This reflects Demmer's actual, allowable costs, plus a reasonable profit of 12.25 percent. Using these costs and profit margin accord with the parties' mutual understanding of

---

[13] In the alternative, even if Demmer were correct that the re-negotiation was optional or could have been ignored because AM General did not complete its audit, given Demmer's efforts to thwart the ongoing audit, AM General is permitted to fix a reasonable price itself under subsection (3) of the same UCC provision. Subsection (3) provides, "When a price left to be fixed otherwise than by agreement of the parties fails to be fixed through fault of one (1) party the other may at his option treat the contract as canceled or himself fix a reasonable price." Ind. Code § 26-1-2-305(3). Under either approach, AM General prevails on its breach of contract claim and is entitled to recover the same damages.

"fair and reasonable" pricing, the obligation to use current, accurate, and complete information when setting a price, and the persuasive record evidence about how to settle not-to-exceed pricing. *See* FoF ¶¶166-67, 171.

E.      <u>AM General's Damages</u>

AM General was damaged by paying far in excess of the reasonable prices at the time for delivery. In 2010, AM General's total overpayment to Demmer was $47,333,309. FoF ¶184. AM General subsequently offset $19,366,811 for overpayments. *Id.* AM General is permitted to retain this amount. Accordingly, Demmer owes AM General $27,966,498 in damages beyond the amount AM General is permitted to retain, plus pre-judgment interest, costs of court, and attorneys' fees and expenses (as described in further detail below). *See* FoF ¶184.

II.      <u>Claim for Breach of Clause 16.</u>

In the alternative, AM General is entitled to recover under Clause 16 of the terms and conditions. The relevant terms and conditions applied to AM General's 2010 purchases of Bi-Metal Doors from Demmer. FoF ¶8.

Clause 16 of AM General's terms and conditions permits AM General to require submission of cost or pricing data. PTX-3-009, cl. 16(B); D.E. 136, at 18. Clause 16 also allows AM General to reduce overcharges revealed by those data. Clause 16(B) provides, "Submission of cost or pricing data may be requested in situations where submission of such data is not otherwise required if the Government contracting officer or Buyer [AM General[14]] determines, in writing, that such data are necessary for the evaluation of the reasonableness of the price of the contract or subcontract or for an evaluation of cost realism." PTX-003-009. AM General

---

[14] Applying the "Definitions" from Clause 2 of the terms and conditions (PTX-003-001), Demmer is the "Seller" and AM General is the "Buyer."

requested Demmer's cost or pricing data in writing.  *See* FoF ¶¶9-11.  In response to that written request, Demmer provided (some) cost or pricing data to AM General.  *See* FoF ¶22.

Demmer previously argued that Clause 16 is triggered only if AM General's prime contract requires submission of such data, but the Court rejected that argument.  *See* Op. & Order (D.E. 136) at 18 ("Demmer's argument that it was only required to submit cost or pricing data to AMG if AMG was required to submit 'cost or pricing data' to the Government is simply incorrect.").  Moreover, the evidence adduced at trial confirms that AM General was required to certify cost or pricing data for 2010 Bi-Metal Door purchases.  *See* FoF ¶185.4.  Accordingly, even if Demmer's obligation to submit cost or pricing data was triggered only when AM General's prime contract required such a submission, AM General has fulfilled that requirement.

Clause 16(A) provides:

> Should Buyer [AM General] or the Government determine that any price including profit, or fee, negotiated with Seller [Demmer] in connection with Order or any modification thereof was increased because the Seller or any of its subcontractors or prospective subcontractors furnished incomplete, inaccurate, or non-exempt cost or pricing data as required by the Truth In Negotiations Act or its implementing regulations or contract clauses, then such price shall be reduced accordingly by Buyer [AM General] and the Purchase Order shall be modified in writing by Buyer [AM General] to reflect such adjustment.

PTX-003-009.  By its terms, this provision gives AM General the authority to reduce Demmer's prices unilaterally if AM General determines that Demmer's prices—including Demmer's profit—were increased because Demmer furnished incomplete or inaccurate cost or pricing data (as that term is defined by TINA, its implementing regulations (the FAR), or contract clauses).

Clause 16 broadly protects AM General from overcharges by its suppliers—it provides both a right and a remedy.  The Court must interpret the clause and the contractual requirements in a way that "harmonizes its provisions as opposed to one which causes the provisions to be

conflicting." *S.C. Nestel, Inc. v. Future Constr., Inc.*, 836 N.E.2d 445, 450 (Ind. Ct. App. 2005) (internal quotation omitted). Demmer suggests that Clause 16(B) should be divorced from Clause 16(A). But there is no basis to decouple the two parts of Clause 16. If AM General could merely request cost or pricing data under Clause 16(B), but could do nothing with those data or protect itself from being overcharged, the contractual provision would make no commercial sense. Additionally, if—as Demmer has repeatedly urged—Clause 16 were read to do nothing more than flow down TINA's requirements in the event of a "defective pricing" claim, then Clauses 39(A)(3) and 48,[15] which apply to such cases, would improperly be rendered surplusage.

Moreover, AM General is entitled to reimbursement if "any price including profit, or fee . . . was increased because the Seller . . . furnished incomplete, inaccurate, or non-exempt cost or pricing data as required by the Truth in Negotiations Act or its implementing regulations or contract clauses." PTX-003-009, cl. 16(A). There is no requirement that the cost or pricing data deemed to be incomplete or inaccurate be certified, that AM General be required to submit such data, or that those data be required by TINA or the FAR. Incomplete or inaccurate data required by "contract clauses" is sufficient to trigger liability. *See id.* AM General requested cost or pricing data from Demmer, pursuant to contract Clause 16(B)—one of the "contract clauses." *See* FoF ¶¶9-11. Thus, at the very least, the data were provided pursuant to a requirement of the parties' "contract clause" and thus the incomplete and inaccurate status of those data triggered Demmer's liability under Clause 16(A).

Like the TINA and the FAR, Clause 16 protects AM General and the Government from overpaying for non-commercial items. The Court previously recognized, moreover, that in

---

[15] Clause 48 incorporates by reference a number of FAR provisions, including FAR 52.215-11, "Price Reduction and Defective Cost o[r] Pricing Data—Modifications." PTX-003-020.

Clause 16, AM General reserved the right to acquire such data from Demmer even if the Government did not demand it from AM General. *See* Op. & Order (D.E. 136) at 18. Similarly, although Demmer has argued that in the absence of a certification of the data, or in the absence of a final price agreement, AM General is not entitled to recover, Clause 16 makes no mention of a certification. The data that inflated the price need not be certified. *See also AM General v. BAE*, ¶¶ 137-138 (rejecting a defense to AM General's terms and conditions based on language imported from TINA and the FAR, including a claim that "data can only be found to be defective on or after the date of price agreement").

Previously, Demmer also argued that it did not violate Clause 16 because the parties failed to settle 2010 prices. The Court rejected this argument, ruling that Clause "16(A) refers to 'any price . . . negotiated with Seller' and does not restrict its applicability to final prices." Order (D.E. 74) at 8. Nothing in the evidence introduced at trial warrants revisiting that decision.

The Court concludes that Demmer furnished AM General cost or pricing data that were incomplete and inaccurate. *See* FoF ¶¶30-46. In so doing, Demmer breached Clause 16.

Assuming *arguendo* that AM General is required to demonstrate reliance on Demmer's inaccurate and incomplete cost or pricing data to establish a breach of Clause 16, the Court concludes that AM General used and relied upon the inaccurate and incomplete data furnished by Demmer to establish the not-to-exceed prices in the February 2010 Change Blanket Contracts.[16]

Because Demmer furnished AM General inaccurate and incomplete data, AM General overpaid for the Bi-Metal Doors when it paid the not-to-exceed prices in the February 2010

---

[16] As noted above, even if Demmer had prevailed on its argument that the February 2010 Blanket Change Contracts established final, settled prices (which it did not), it would nevertheless be liable to AM General under Clause 16.

Change Blanket Contracts (which, in turn, were based on Demmer's December 2009 price proposal, *see* FoF ¶79). Therefore, Demmer's prices "shall be reduced accordingly." PTX-003-009, cl. 16(A). Based on the evidence adduced at trial, the Court concludes that AM General suffered the same damages in connection with the Clause 16 breach as it did in connection with the breach of the February 2010 Change Blanket Contracts. Had Demmer provided accurate and complete data to AM General, AM General would have refused to pay the prices that Demmer had proposed. *See* FoF ¶¶42.5, 180.2. By the time that AM General had complete and accurate information from Demmer, the DCAA had issued its audit report on Demmer's 2010 actual costs. *See* FoF ¶¶167-170. At that point, despite AM General's efforts to persuade the Government to pay higher prices for the Bi-Metal Doors in 2010, TACOM insisted on paying no more than Demmer's actual, allowable costs plus a 12.25 percent profit. *See* FoF ¶172.1.

Therefore, and in the alternative, AM General is entitled to recover the same amounts under the Clause 16 claim as the Court ordered under the February 2010 Change Blanket Contracts. *See* FoF ¶184.[17]

---

[17] Demmer argued that because Bingham did not generate a separate damages calculation, AM General did not prove its damages. *See* Tr. 1083:10-19 (Demmer Closing). But Bingham already generated a damages calculation that AM General had shown applies under Clause 16. In any event, Demmer, which created this problem by furnishing inaccurate and incomplete data, has the burden of showing an alternative, justifiable damages number. *See, e.g.*, *Boone Cnty. Rural Elec. Membership Corp. v. Layton*, 664 N.E.2d 735, 741 (Ind. Ct. App. 1996) ("[A]ll doubts and uncertainties as to the proof of the exact measure of damages must be resolved against the defendant because the most elementary conception of justice and public policy requires that the wrongdoer bear the risk of uncertainty which his own wrong has created."). Demmer never offered a number to support an alternative amount.

III.    <u>AM General Prevails on the Claim for Breach of Clause 24.</u>

The terms and conditions include a dispute resolution mechanism that provides for, *inter alia*, AM General issuing a final written decision on the proposed resolution of the dispute before litigating.  *See* PTX-003-011, cl. 24(A).  The terms and conditions also provide, "Pending final decision of any dispute hereunder, the Seller shall proceed with performance of the Order.  If the dispute arises out of a difference in interpretation between the parties as to the performance requirements of the Order, then Seller shall continue performance in accordance with the interpretation of performance as determined by" AM General.  *Id.* cl. 24(B); *see also* Order (D.E. 74) at 9.

The Court concludes Demmer failed to comply with AM General's Final Decision letter.  *See* FoF ¶¶138-139.  In so doing, Demmer breached Clause 24.

Demmer's breach of Clause 24 resulted in the following damages to AM General:  (1) the damages from other breaches of the relevant terms of the contract, which have already been addressed above; and (2) the lost value of the funds that should have been paid.  The second type of damages may be recovered through prejudgment interest, to which AM General is entitled from the date of the Final Decision, September 9, 2011, forward.

IV.    AM General Prevails on the Claim for Attorneys' Fees, Expenses, and Costs.

Clause 29 of the terms and conditions includes, *inter alia*, a fee-shifting provision in AM General's favor.  Specifically, Clause 29(B) provides, in relevant part, "Seller shall indemnify and hold Buyer harmless to the full extent of any loss, damage or expense, including lost profit, attorney's fees and court costs, for any failure or alleged failure of Seller to comply with the requirements of this Purchase Order."  "It is well established that parties are permitted to enter into agreements containing fee-shifting provisions as long as the provision does not violate

public policy." *Gerstbauer v. Styers*, 898 N.E.2d 369, 379 (Ind. Ct. App. 2008) (internal quotation marks omitted); *see also Wilcox Lumber Co. v. Andersons, Inc.*, 848 N.E.2d 1169, 1172 (Ind. Ct. App. 2006) (explaining that "the purpose of allowing an award of attorney fees in this type of case is to more fully compensate a party who has successfully enforced his legal rights in court" (internal quotation marks omitted)).

The Court has previously ruled that Clause 29 "necessarily covers first-party claims," and thus is not limited to situations in which AM General is seeking indemnification from a supplier for amounts owed to another party. Order (D.E. 74) at 10. Furthermore, AM General proved that Demmer's breaches have cost AM General tens of millions of dollars in out-of-pocket losses to the Government. *See* FoF ¶185.

Because AM General has prevailed on its breach-of-contract claims, in addition to recovering damages, by the terms of Clause 29(B), AM General also is entitled to recover its attorneys' fees, expenses, and court costs.[18] Pursuant to the Amended Pretrial Order (D.E. 147), the Court will rule on the quantum of fees and costs to be awarded through post-trial submissions on the schedule set forth below.

V.    Demmer Failed To Prove Both Remaining Counts of Its Counterclaim.

As explained in the Findings of Fact, the Court concludes that Demmer failed to meet its burden of proving liability (breach), causation, or damages on either remaining count of Demmer's Counterclaim. *See* FoF ¶¶186-191.

---

[18] "Expenses" in the context of the parties' contract includes not only attorneys' fees and taxable costs under 28 U.S.C. § 1920, but also expert witness fees, travel expenses, paralegal fees, computer assisted research costs, mediation costs, and related litigation expenditures. *See, e.g., Branham v. Snow*, No. 1:01-cv-0152-JDT-TWL, 2006 WL 1750443, at *12-*16 (S.D. Ind. June 19, 2006); *Allied Enters., Inc. v. Exide Corp.*, No. IP 99-1211-C H/K, 2002 WL 424996, at *8 (S.D. Ind. Jan. 15, 2002).

# **CONCLUSION**

1.      For the foregoing reasons, the Court concludes that AM General prevails on its breach of contract claim in its entirety, enters judgment in AM General's favor and against Demmer, and awards AM General $27,966,498, plus prejudgment interest from September 9, 2011 to the date of this judgment, plus attorneys' fees and costs.  AM General also is entitled to post-judgment interest.

2.      The Court further holds that AM General properly withheld the excessive payments made to Demmer and need not return them.  Additionally, the Court holds that Demmer has not met its burden of proving liability (breach), causation, or damages on either remaining count of Demmer's Counterclaim.  Counts I and II of Demmer's Counterclaim are dismissed with prejudice and Demmer shall take nothing for its Counterclaim.

3.      The parties are directed to meet and confer within 14 days on the amounts to be added to the judgment for prejudgment interest, costs, and attorneys' fees.  To the extent the parties cannot reach agreement on the amounts to be added to the judgment, AM General is directed to file post-judgment briefing setting out its position on any outstanding disputes within 28 days of the judgment; Demmer must file any objections or response within 14 days of AM General's submission; and AM General may reply within 14 days after Demmer's response. Pursuant to N.D. Ind. L.R. 54-1, AM General's deadlines for submissions for Costs and Attorneys' Fees under Fed. R. Civ. P. 54 are hereby extended as set forth herein.


    Entered: This 6th day of October 2014.

                                            s/ William C. Lee
                                            United States District Court

86